## SAN JOAQUIN LIGHT & POWER CORPORATION v. McLAUGHLIN, Collector of Internal Revenue.*

### No. 6883.

Circuit Court of Appeals, Ninth Circuit.

June 19, 1933.

MACK, Circuit Judge, dissenting in part.

Thomas R. Dempsey and A. Calder Mackay, both of Los Angeles, Cal., for appellant.

I. M. Peckham, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

White & Case, of New York City, and Robert H. Montgomery and J. Marvin Haynes, both of Washington, D. C. (Walter S. Orr, Russell D. Morrill, and A. C. Newlin, all of New York City, of counsel), amici curiæ.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

WILBUR, Circuit Judge.

The San Joaquin Light & Power Corporation, hereinafter referred to as "the taxpayer," brought this action to recover $35,717.22 income tax paid by it for the taxable year 1922. This amount is the tax imposed upon $285,737.79 income which the plaintiff contends is subject to an allowable deduction for that taxable year under section 234 (a) (2), (4) of the Revenue Act of 1921 (42 Stat.

*Rehearing denied July 24, 1933.

254). The deduction claimed is the sum of two items, one a premium of $105,000 paid to the bondholders upon a retirement of a 1920 bond issue of $2,625,000, and the other $180,737.79, representing unamortized discount and expense incurred in floating that bond issue. A jury was waived. The facts were stipulated and judgment was rendered by the trial court in favor of the collector of internal revenue, hereinafter referred to as the collector. The taxpayer takes this appeal.

■ The taxpayer is a public utility having a large capital and a large bonded indebtedness. In 1920 it sold $2,625,000 of its Series D 8 per cent. collateral trust bonds, due in 1935, for $2,441,250. In addition to this discount of $183,750 there were expenses incurred in connection with the issuance of these bonds amounting to $15,173; the unamortized portion thereof being the above-mentioned sum of $180,737.79. The trust agreement securing the bonds designated as "Series D 8 per cent. bonds," payable in 1935, provided also for the issuance of additional bonds designated therein as "Series C, 6 per cent. bonds," payable in 1950, which were to be deposited as collateral for the aforementioned Series D bonds. It provided that at any time at the option of the holder of a Series D 8 per cent. bond it could be surrendered for a Series C 6 per cent. bond, and $50 additional cash premium for each $1,000 bond. The trust agreement gave the taxpayer an option to pay off these Series D 8 per cent. bonds at any time by paying the par value thereof plus a premium of $40 on each $1,000 bond. The taxpayer having made arrangements for refinancing the 1920 bond issue, on May 1, 1922, notified the bondholders that it would exercise its option and also called the attention of the holders of the Series D 8 per cent. bonds to their above mentioned option. In pursuance of this notice 43 per cent. ($1,133,000) of the Series D 8 per cent. bond issue was paid in cash derived from the sale to the public of bonds designated as Series B 6 per cent. 1952 bonds at 1 per cent. discount (a $1,000 bond for $990), and the balance (57 per cent. of the whole issue amounting to $1,492,000) was exchanged for Series C 6 per cent. bonds of the same par value, plus $50 cash for each $1,000 Series D 8 per cent. bond. Thus, for the purpose of exchange, the $1,000 Series C 6 per cent. bonds (dated 1920, payable in 1950) were valued at $990 cash. At the time of the sale of the 1920 bonds the taxpayer set up on its books an amortization charge spreading the discount and expense of these bonds ($183,750 plus $15,173) over their life (15 years). At the time of the refinancing of this bond issue in 1922 unamortized discount and expense attached to the Series D 8 per cent. bond issue was $180,737.79. This unamortized expense of the 1920 bond issue was charged on the taxpayer's books to the new bond issues, 43 per cent. thereof, or $77,717.25, being apportioned to the Series B 6 per cent. 1952 bonds, and the balance, $103,020.54, being apportioned to the Series C 6 per cent. 1950 bonds. In addition thereto the premium of $40 paid to the holders of the 1133 Series D 8 per cent. 1935 bonds, which were exchanged for Series C 6 per cent. 1950 bonds amounting to $45,320, was entered on the taxpayer's books as "unamortized discount and expense, Series C, 1950 bonds" to be subsequently amortized. With reference to the Series B 6 per cent. 1952 issue, sold to the public at $990 per $1,000 bond, being 1 per cent. below par, the discount, $11,330, was charged on the plaintiff's books to "Unamortized discount and expense, Series B 6 per cent. 1952 bonds." The $74,600 cash item paid to the holders of the 1492 Series D 8 per cent. bonds, who accepted Series C 6 per cent. 1950 bonds, plus the $50 additional cash on each $1,000 bond, was charged on the books to "Unamortized discount and expense, Series C 6 per cent. 1950 bonds" in two separate items, as follows: Premium on 1492 D 8 per cent. bonds at $40, $59,680; discount on 1492 C 6 per cent. bonds, $14,920; total, $74,600, to be subsequently amortized. The above-mentioned items of $45,320 and $59,680 constitute the $105,000 claimed as a premium, applicable to the satisfaction of the 1920 Series D 8 per cent. bonds and deductible from 1922 income.

The taxpayer does not claim the discount of 1 per cent. on the B and C six per cent. bonds as a deduction on the retirement of the D 8 per cent. bonds, but concedes that this amount was properly set up on the books to be amortized during the life of the B and C six per cent. bonds.

It will be observed that the taxpayer claims that its method of spreading the amortization of its loss upon the 1920 Series D 8 per cent. bond issue over the life of the new Series B and C 6 per cent. bonds, issued to pay off that bonded indebtedness was erroneous from the income tax standpoint, although required by the California Railroad Commission as a basis for rate making, and it is entitled to a deduction from its 1922 income of the whole amount of the unamortized discount and expense of floating the 1920 D 8 per cent.

bond issue of $180,737.79, and also of the premium of $105,000 paid upon the retirement of the Series D 8 per cent. bonds.

The commissioner, on the other hand, contends that the taxpayer is and should be bound by its books with reference to its method of dealing with the expense, discount, and premium in connection with these three bond issues, particularly in view of the fact that the 1922 bond issues were for the purpose of carrying out the agreement between the taxpayer and its Series D 8 per cent. 1935 bondholders with reference to refunding of that indebtedness made at the time of their issuance and as a part of the obligations then mutually assumed by the taxpayer and its bondholders.

Discount, on the one hand, and premium, on the other, in case of a bond issue are merely a means of adjusting the transaction to the current market rate for money based upon the credit of the debtor and the availability of money for lending by the creditor. It is recognized by the rules of the Treasury Department and by the systems of accounting in vogue in corporate affairs that these items of premium or discount, as the case may be, are but methods of adjusting the actual cost of money, and therefore, whether there is a discount or premium, that is, whether there is a loss or a profit in either case, it should be spread over the term of the bonds to make the books of the corporation reflect the actual annual cost of money rather than the nominal rate specified in the bond, so that during such term funds should be accumulated by the borrower in annual installments sufficient with interest to pay such discount or loss; or in case of premium, or gain, that an apportionate amount of premium should be set aside each year to decrease the nominal interest for that year to the actual cost of the money for that year. Western Maryland R. Co. v. Commissioner (C. C. A. 4) 33 F.(2d) 695, and references therein.

The applicable rule of the Treasury Department (Regulations 62, Art. 545) is set out in the footnote.[1] The rule of the Treas-

ury Department and the ordinary system of accounting as well, requires that each bond issue be treated as separate and distinct and that consequently when the bond issue is paid off the unamortized amount of discount which had been spread over the life of the bond is deemed paid at the time of the payment of the bond if it is redeemed at par, as in the case at bar. The amount paid to redeem the bond, of course, would be determined by the agreement between the taxpayer and the bondholder made at the time of redemption, or, as in the case at bar, by the agreement made in 1920 at the time the Series D 8 per

---

[1] Treasury Dept. Reg. 62:

"Art. 545. Sale and retirement of corporate bonds.—(1) (a) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. (b) If thereafter the corporation purchases and retires any of such bonds at a price in excess of the issuing price or face value, the excess of the purchasing price over the issuing price or face value is a deductible expense for the taxable year. See section 234 of the statute and article 563. (c) If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year.

"(2) (a). If bonds are issued by a corporation at a premium, the net amount of such premium is gain or income which should be prorated or amortized over the life of the bonds. (b) If thereafter the corporation purchases and retires any of such bonds at a price in excess of the issuing price minus any amount of premium already returned as income, the excess of the purchase price over the issuing price minus any amount of premium already returned as income (or over the face value plus any amount of premium not yet returned as income) is a deductible expense for the taxable year. (c) If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price minus any amount of premium already returned as income, the excess of the issuing price minus any amount of premium already returned as income (of the face value plus any amount of premium not yet returned as income) over the purchase price is gain or income for the taxable year.

"(3) (a). If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. (b) If thereafter the corporation purchases and retires any of such bonds at a price in excess of the issuing price plus any amount of discount already deducted, the excess of the purchase price over the issuing price plus any amount of discount already deducted (or over the face value minus any amount of discount not yet deducted) is a deductible expense for the taxable year. (c) If, however, the corporation purchases and retires any of such bonds at a price less than the issuing price, plus any amount of discount already deducted, the excess of the issuing price plus any amount of discount already deducted (or of the face value minus any amount of discount not yet deducted) over the purchase price is gain or income for the taxable year. * * * "

"Art. 848. Surplus and undivided profits; discount on sale of bonds.—Discount allowed on the sale of bonds is in effect an advance on account of interest, so that the effective rate of interest in such a case is equal to the sum of the nominal rate plus the rate necessary to amortize the discount over the life of the bonds. Where, under incorrect accounting practices, the discount on bonds has been charged to a property account or otherwise incorrectly carried as an asset, and is so reflected in the surplus account, it is necessary in computing invested capital to make an adjustment in respect of such discount. See Article 563."

"Art. 563. Sale of capital stock, bonds and capital assets.—A corporation sustains no deductible loss from the sale of its capital stock. See Article 543. If it sells its bonds at a discount, the amount of such discount is treated in the same way as interest paid, and if it retires its bonds at a price in excess of the issuing price, such excess may usually be deducted as expense. * * * "

cent. 1935 bond was issued. In either event the transaction is concluded by the redemption of the 1920 bond. At the time of redemption the bondholder is paid the par value of the bond so that he is in effect paid for the use of the money he lent the amount of the discount (both amortized and unamortized), which the taxpayer suffered at the time of the issue in 1920; he is also paid a premium for the privilege of anticipating the maturity of the bond in 1922. Both the discount in 1920 and the premium paid in 1922 represent a part of the cost of the money procured in 1920 by the sale of the Series D 8 per cent. bonds. The payment of the unamortized discount and expense of the Series D 8 per cent. bonds in 1922 is thus either a payment of interest which the statute expressly directs should be deducted from current income or is a loss of capital which the statute also allows as a deductible loss. Section 234 (a) (1), (2), Revenue Act 1921.

It is this amount so paid which the taxpayer claims should be treated as a deductible loss or as a payment of interest upon money theretofore borrowed and at that time repaid. If it is doubtful under the Revenue Act of 1921 (section 234 (a) (1), (2), supra), how these amounts of discount and premium so paid should be treated, the doubt is set at rest by the above rule of the Treasury Department (Reg. 62, art. 545, supra, set out in the footnote) applicable to the sale and retirement of bonded indebtedness. The rule is reasonable; it has been acted upon for many years, and has been tacitly approved by Congress by repeatedly re-enacting all the provisions of the revenue act here involved without substantial change, and has been expressly approved by the Supreme Court, in part upon that ground, in U. S. v. Kirby Lumber Co., 284 U. S. 1, 52 S. Ct. 4, 76 L. Ed. 131. Therefore, the contentions of the collector that the taxpayer is bound by the system of bookkeeping it adopted in relation to these expenditures, and his further contention that the transaction consummated in 1922 was anticipated at the time the Series D 8 per cent. bonds were issued in 1920 by the contract then entered into, and consequently that the refunding transaction in 1922 was a mere substitution of one form of indebtedness for another in pursuance of that original agreement, do not justify a departure from the treasury rule or the statute in pursuance of which it was adopted. Reg. 62, Art. 545; Revenue Act 1921, § 234 (a) (1), (2), supra.

With reference to the exchange of 1492 Series C 6 per cent. 1950 bonds of the par value of $1,000 each for 1492 Series D 8 per cent. 1935 bonds of the same par value, there seems to be no good reason for treating the $40 cash payment made in connection with the transfer on any different basis from the 1133 bonds which were redeemed in cash. The views we have expressed are in accord with a recent decision of the Circuit Court of Appeals of the first circuit in an analogous case where there was a retirement of serial secured notes, in part by purchase of outstanding notes, and in part by exchange of gold bonds secured by mortgage for the balance of the outstanding serial secured notes. It was held that the profit so made was taxable as income for the year in which the purchase and exchange occurred. Commissioner v. Coastwise Transp. Corp. (C. C. A.) 62 F. (2d) 332. Had there been a corresponding loss, as in the case at bar, the same ruling would require its deduction from the income of that year.

The commissioner further contends that by reason of the system of bookkeeping the taxpayer has adopted and the consequent deductions from its income it has claimed and received in later taxable years, the alleged loss due to the refunding operations in 1922 has been spread over these subsequent taxable years and that the taxpayer has had the advantage of the amortization installments as deductions in subsequent years. The method in which the taxpayer keeps his books is not decisive as to these later years any more than it is as to 1922, particularly where the books are kept in accordance with the directions of the California Railroad Commission. This view was announced by the Supreme Court in the decision of a case where the books of an interstate carrier were kept in accordance with the directions of the Interstate Commerce Commission. Old Colony R. Co. v. Commissioner, 284 U. S. 552, 52 S. Ct. 211, 76 L. Ed. 484. See, also, our own decision in Lichtenberger-Ferguson Co. v. Welch (C. C. A.) 54 F. (2d) 570. In this action we are not concerned with subsequent tax years. Neither the government nor the taxpayer is estopped with relation thereto.

In 1928 the taxpayer again refinanced the outstanding bonded indebtedness and substituted for the Series B and C 6 per cent. bonds above referred to, new bonds carrying over into its books the entire unamortized expenses and deductions due to the financing of all these bonds (Series D 8 per cent., Series B 6

per cent., and Series C 6 per cent.). In our view this fact also is immaterial and for the same reason that the other book entries are not controlling.

### Statute of Limitations.

The total income tax of the taxpayers for the year 1922 amounting to $166,407.73 was paid in four equal installments of $41,609.93 on March 14, 1923, June 13, 1923, September 15, 1923, and December 15, 1923. The commissioner contends that the aliquot part (one-fourth) of the amount claimed as a refund paid March 14, 1923, is barred by the applicable statute of limitations, Revenue Act 1926, 44 Stats. 9, § 284 (b) (1) and (2), 26 USCA § 1065 (b) (1, 2), because the payment was made more than four years before a claim for a refund thereof was filed on March 19, 1927. This is immaterial if the portion of the tax paid within four years is sufficient to cover the claim for refund. That statute is in part as follows:

§ 284 (a). "Where there has been an overpayment of any income * * * tax imposed by this Act, * * * the Revenue Act of 1921 * * * the amount of such overpayment * * * shall be refunded immediately to the taxpayer.

"(b) Except as provided in subdivisions (c), (d), (e), and (g) of this section—

"(1) No such credit or refund shall be allowed or made after three years from the time the tax was paid, in the case of a tax imposed by this Act * * * nor after four years from the time the tax was paid in the case of a tax imposed by any prior Act, unless before the expiration of such period a claim therefor is filed by the taxpayer; and

"(2) The amount of the credit or refund shall not exceed the portion of the tax paid during the three or four years, respectively, immediately preceding the filing of the claim, or, if no claim was filed, then during the three or four years, respectively, immediately preceding the allowance of the credit or refund."

The Court of Claims discusses this proposition in a case involving an estate tax and for further elucidation of the subject we refer to its opinion in Hills v. U. S., 50 F.(2d) 302, and to its opinion on rehearing in the same case reported in 55 F.(2d) 1001, wherein the court considers the difference in the legislation with reference to suits brought to recover moneys paid upon estate taxes and upon income taxes.

The judgment is reversed, with instructions to the trial court to enter judgment in favor of the plaintiff upon the findings for the sum of $35,717.22, together with 6 per cent. interest thereon from December 15, 1923, as provided by law. 28 USCA § 284, Jud. Code, § 177, as amended May 29, 1928, 45 Stats. 877, ch. 852, § 615 (a).

MACK, Circuit Judge (dissenting in part).

I concur in the opinion of the court except as to the $103,020.54 and the $59,680, the former being 57 per cent. of the unamortized discount and expense in 1922; the latter the $40 premium on the 1,492 D 8 per cent. bonds exchanged pursuant to the original option for the Series C 6 per cent. loan.

The treasury regulation set out in the majority opinion does not cover this part of the case. Even though the money raised by appellant through the sale of the B bonds is stipulated to have been used to pay off the 43 per cent. of the D bonds, the two transactions were entirely distinct. What appellant did was to raise money through the sale of its B bonds for its general purposes—the predominant one of which was the payment of as many of the D bonds as were not exchanged. There was no integral relation between the D bonds so paid off and the new B bonds sold on the market in order to raise the money to pay them off. If appellant had had sufficient money in its treasury, there would have been no need to issue the new B securities. These B bonds were in no sense substituted for or a continuation of the D bonds. The raising of the money through the sale of the B bonds was a transaction entirely distinct from the paying off of the D bonds.

The situation, however, as to the C bonds is, in my judgment, entirely different. Those D bondholders who made the exchange exercised a right that had been created when the D bonds were issued. The C bonds were issued at the same time for the very purpose of being substituted if the holders should exercise their option. When the exchange was made in 1922, the indebtedness originally created and evidenced by the 1492 D bonds was in no sense paid; its form was merely changed by an extension of the maturity, a decrease in the interest rate, in form to 6 per cent.; in substance, however, to a somewhat higher rate represented by the $40 cash premium, and the $10 cash discount paid at the time.

In my judgment, neither the unamortized part nor the premium was any more a loss to the company for the year 1922 than was the $10 discount. As appellee contends, this un-

amortized portion was in 1922 just what it was in 1920—a prospective, but not a realized, loss. It would become an actual loss only if and when appellant actually paid off and retired the bonds at par. The substitution of the new bonds pursuant to the original contract is not, however, a payment of the debt; the debt remains. One document has merely been substituted for another as evidence of it.

I concur, too, fully, in appellee's argument that the payment of the $50 in 1922, pursuant to the terms under which the original indebtedness was created in 1920, is just as much a discount attaching to the C bond as the original $70 was a discount attaching to the D bond.

In Commissioner v. Coastwise Transportation Corporation, 62 F.(2d) 332 (C. C. A. 1, 1932), gold bonds for a much lesser amount were accepted by note holders in exchange for the corporation's notes. The court held that the difference in the face values of the bonds and the notes was a taxable profit earned by the corporation in the year of the exchange. In that case, however, unlike the instant case, the exchange was purely voluntary on both sides, and not pursuant to a contractual option granted to the note holders at the time that the notes were executed. The situation in that case, because of the absence of this contractual right, was no different than it would have been if instead of offering the bonds to the note holders, the corporation had sold them on the market and instead of exchanging had actually purchased and canceled the notes.