ROBERTS & PORTER, INC., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83515. Filed October 10, 1961.

*Timothy G. Lowry, Esq.*, for the petitioner.
*Theodore W. Hirsh, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1956 in the amount of $40,436.86. The issue for our decision is whether the amount paid by petitioner to redeem its convertible notes in excess of the issuing price is a deductible expense in whole or in part where the excess of the purchase price over the call price is attributable to the conversion feature of the notes.

### FINDINGS OF FACT.

Most of the facts have been stipulated and are herein incorporated by this reference.

Roberts & Porter, Inc. (hereinafter referred to as petitioner), is a corporation organized and existing under the laws of the State of Illinois, with its principal office at Chicago, Illinois.

Petitioner filed its Federal income tax return for the taxable year 1956 with the district director of internal revenue, Chicago, Illinois.

On August 28, 1952, the board of directors of petitioner authorized the issuance of 75, 6-percent, 10-year convertible notes each having a par value of $1,000, to be sold to various shareholders and employees of the corporation at par. Each $1,000 note was convertible into 6 shares of petitioner's common stock, and was callable at any time on 30 days' notice at 106 percent, plus accrued interest.

In September 1952, 64 of such notes were sold by petitioner for their par value of $64,000. The remainder of the authorization was never sold.

At the same board meeting authorizing the issuance of the notes, the chairman called to the members' attention that a 1947 agreement between petitioner and the principal employee-shareholders, Adams, Grandt, and Surrey, had become outmoded in view of the "changes in capital structure of the company and the issuance of new securities." Pursuant to a resolution then adopted, petitioner entered into a new

stock purchase agreement on September 1, 1952, with Adams, Grandt, and Surrey, providing for the purchase of their shares in the event of death or ceasing to be employed by petitioner, or decision to sell their shares in the company. This agreement implemented the long-established policy of petitioner to maintain its controlling shares in employees active in petitioner's business. The price agreed to be paid for the shares of a shareholder who died, or whose employment by petitioner was terminated, or who decided to sell his shares, was to be the book value as of the end of the month following the death or retirement of the shareholder or his decision to sell. The proceeds of any life insurance policies insuring the life of the deceased shareholder were not to be considered, but the cash value of any such policy or policies as of the day preceding the date of death, retirement, or notice of sale was to be considered.

In June of 1955, although none of the notes were yet converted, Grandt and Surrey deemed the disproportionate issuance of notes to the major shareholders to have "destroyed" their proportionate stock ownership. They thereupon entered into an agreement providing for the sale by Adams to Grandt and Surrey of some of his shares at a price of $166.66⅔ per share. The price was referred to in the contract as the cost of the shares to Adams. The cost was arrived at by allocating one-sixth of the cost of a $1,000 note to each of the 6 shares into which the note could be converted. The actual shares then held by each of the major shareholders, plus those which they could receive upon the conversion of their respective notes, thus approximated their proportionate ownership which existed prior to the issuance of the notes.

On August 12, 1956, Adams died possessing 393 shares of the total 1,000 shares outstanding. Of this total, 343 shares were subject to sale under the 1952 agreement, and 50 shares were subject to sale to Grandt under the 1955 adjustment agreement. Adams also owned $40,000 face value of petitioner's notes which were convertible into 240 shares of stock. The notes were not subjected to any purchase and sale agreement.

Subsequent to the death of Adams, but prior to August 31, 1956 (the closing date used to determine book value of stock under the 1952 agreement), the holders of all the remaining convertible notes converted them into 144 shares of stock. As of August 31, 1956, therefore, there were outstanding 1,144 common shares of stock and there were reserved for conversion 240 shares for the convertible notes held by the Adams estate. The notes (other than those held by the estate) were all converted after Adams' death upon the recommendation of petitioner's attorney, so that the increased number of shares outstanding would decrease the book value per share and, therefore, decrease the price to be paid for Adams' shares under the 1952 agreement.

The 1952 agreement made no provision for the purchase of notes upon the death of a noteholder-shareholder, nor for the treatment to be afforded the shares reserved for conversion of the notes in the determination of book value of the outstanding shares.

After the death of Adams, a dispute arose between petitioner and Adams' estate as to whether or not the 240 shares reserved by petitioner for the conversion of the notes owned by Adams should be taken into account in determining the book value of the stock in Adams' estate subject to the 1952 agreement. If the shares reserved for conversion were to be taken into account, the book value of the stock under the agreement would be $490.68 per share; if not, the book value would be $558.65 per share.

There was also a dispute as to whether the stock to which the notes were convertible was covered by the 1952 agreement, and, as a corollary, whether the estate was obligated to sell the notes held by it (and convertible into 240 shares) at a price equal to the value of the shares as determined by the agreement.

While the life insurance proceeds on the life of Adams caused the actual book value of all of the shares (including the 240 reserved for conversion) to be $609.75 per share, such proceeds were to be disregarded under the terms of the purchase agreement.

The dispute was resolved by a settlement agreement executed on December 20, 1956. Pursuant to that agreement, petitioner purchased from Adams' estate the stock possessed by the estate which it was obligated to buy under the 1952 agreement for $490.68 per share. Petitioner also purchased the 40 notes for the total sum of $117,763.20. The purchase price of the notes was exactly equal to $490.68 per share for the 240 shares into which the $40,000-face-value notes were convertible. Both figures represent the book value of the stock based under the assumption that the 240 shares were outstanding as of the closing date and disregard any life insurance proceeds received by petitioner as per the 1952 agreement. After the purchase, the notes were retired and canceled.

On its 1956 income tax return, petitioner deducted $77,763.20, being the excess of the purchase price, $117,763.20, over the issuing price of $40,000 of the notes held by the estate as a loss on the retirement of debt. Respondent disallowed the deduction on the ground that an allowable loss had not been established.

### OPINION.

In 1952, petitioner issued to one of its principal shareholders, Adams, 40 convertible notes at their face value of $40,000. The notes, convertible into 240 shares of petitioner's stock, were never converted by Adams and they were part of his estate upon his death in 1956. Petitioner, realizing the estate could readily convert the notes into

stock, and desiring to keep all of its shares in its active employee-shareholders, purchased the 40 notes for a total price of $117,763.20. The purchase price of the notes was based upon the book value of the 240 shares into which the notes were readily convertible.

While the notes were not provided for in the 1952 purchase agreement executed a few days after their issuance, the price paid by petitioner to purchase each note from the Adams estate was based upon the book value per share as determined under the 1952 agreement. Petitioner deducted $77,763.20, representing the excess of the purchase price over the original issuing price on its 1956 income tax return as a loss on the retirement of debt. Respondent disallowed the deduction on the ground that petitioner had not shown the loss was the basis for an allowable deduction.

There is no intimation by respondent that the transaction was not made in good faith or was a sham or a tax avoidance scheme. Petitioner admittedly had no alternative, if it wanted to maintain its stock in active employee-shareholders, other than to purchase the notes from the estate for at least that price. The price paid was arrived at after arm's-length bargaining. That the interests of the estate and of petitioner were adverse is shown by the fact that the other note-holders were requested by petitioner to convert their notes after Adams' death to decrease the book value per share which petitioner was obligated to pay to the estate for the stock which it held.

While the expense involved in purchasing the notes in issue may have been reasonable and expended pursuant to a valid policy of petitioner's, the allowance of a deduction from income does not turn on general equitable considerations. It "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Co.* v. *Helvering*, 292 U.S. 435, 440 (1934).

Petitioner bases its claim to a deduction generally under section 162(a) of the 1954 Code which provides for the allowance of deductions for "ordinary and necessary" business expenses. Specifically, petitioner relies heavily upon a regulation implementing the Code allowing for the deduction of a premium paid by a corporation when it redeems its bonds. The regulation provides:

(c) *Sale and purchase by corporation of its bonds.* (1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. *If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year.* If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is income for the taxable year. [Sec. 1.61–12(c)(1), Income Tax Regs. Emphasis supplied.]

Petitioner maintains that under the clear and unambiguous provisions of the above regulation the entire amount it paid to redeem its notes, in excess of the issuing price, is fully deductible.

In order to properly ascertain the scope of the above regulation, it is pertinent to look to the Code provisions which it implements. While the regulation is numbered to implement section 61 of the 1954 Code (concerning the recognition of income), it is apparent that the portion of the regulation concerning deductions derives its authority from section 162 of the 1954 Code allowing the deduction of ordinary and necessary business expenses.

It has long been established that the words "ordinary and necessary" are not so unambiguous as to preclude the regulations from specifically enumerating certain expenditures as deductible under this section. *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326 (1941). It, however, is equally well established that a regulation cannot be interpreted and given effect in such manner as to contravene a specific statutory enactment. See *Boske* v. *Comingore*, 177 U.S. 459 (1900).

Respondent contends that the regulation in question is not applicable to the premium in issue inasmuch as, although nominally paid to redeem notes, it was paid, in reality, to purchase the stock rights which were an integral part thereof. Respondent bases this contention on the fact that the premium paid by a corporation to redeem its stock is specifically disallowed by section 311(a) of the 1954 Code, which provides:

SEC. 311. TAXABILITY OF CORPORATION ON DISTRIBUTION.

(a) GENERAL RULE.—* * * no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of—

* * * * * * *

(2) property.

The regulations implementing this section expressly include stock redemptions under this section. Sec. 1.311–1(a), Income Tax Regs. It is clear, therefore, that no part of the price would have been a deductible expense had the estate or Adams converted the notes in issue into stock, and had petitioner directly redeemed the stock. See *Jewel Tea Co.* v. *United States*, 90 F. 2d 451 (C.A. 2, 1937).

As to that part of the redemption price equaling the call price of 106, we are satisfied that the 6-percent premium (here totaling $2,400) is deductible by petitioner. The call price was fixed by the notes themselves at the time of their issuance. The provisions for redemption are typical of the ordinary run-of-mine terms of bond and note issuance. To the extent of the 6-percent premium paid, we have no doubt that the provisions of regulations section 1.61–12(c)(1), *supra*, are applicable and we, therefore, hold that the 6-percent premium is deductible as an ordinary and necessary expense. See *San Joaquin*

*Light & Power Corporation* v. *McLaughlin*, 65 F. 2d 677 (C.A. 9, 1933). We find no authority or reasoning which would engraft an exception upon regulations section 1.61–12(c)(1) in this respect merely because the call price was only a part of a larger redemption price paid because of conversion features of the notes.

As to the premium paid in excess of the call price, petitioner concedes on brief that "there is no question that the amount paid for the notes, in excess of their call price, was attributable solely to the fact that each note was convertible at the option of the holder into 6 shares of the petitioner's stock."

The further question thus arises as to whether, under the circumstances, the excess of the total redemption price over the call price is likewise deductible. We think not.

Here, we do not have a typical regulations section 1.61–12(c)(1) transaction. Moreover, we must consider here not only the provisions of section 162(a) and regulations section 1.61–12(c)(1), *supra*, but must coordinate, integrate, and construe them with section 311 (a)(2) and regulations section 1.311–(1)(a), *supra*.

Petitioner redeemed its notes for the specific purpose of preventing its stock from getting into the hands of outside interests. It paid a price based upon the agreed book value of the stock. The excessive premium paid was in direct regard, relation, and with reference to the 240 shares of stock into which the notes were convertible, and the substance of the transaction was admittedly to acquire the stock rights and retire them. Cf. *Blechman & Sons, Inc.* v. *Commissioner*, 229 F. 2d 925, 929 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court. While nominally paid for the notes, the excessive amount paid over the call price had no relationship to the par value of the bond, its interest rate, or maturity. It is our view that the purchase and retirement of the notes was partially a transaction "with respect to its stock" to the extent of the amount paid in excess of the call price of the bonds.

Under the circumstances, we think that section 311 requires us to clearly define and distinguish what is paid for bonds and what is paid "with respect" to stock. The distinction is made on the basis of actual property rights purchased rather than on the basis of mechanical actions. Combining a note and stock rights in a single security is, of course, quite proper, but it cannot prevent a proper determination of what property and property rights are thus acquired on redemption. The tax effect, as well as the economic effect, should be the same whether the several rights are represented by separate certificates or by a single certificate. It has been stated repeatedly that the incidence of taxation depends upon the substance of a transaction. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334.

The necessity of distinguishing between premiums paid by a corporation to redeem bonds, notes, and the like and premiums paid in relation to conversion rights of its stock is inherent in applying the underlying principle allowing redemption premiums to be deducted by a corporation. In the case of nonconvertible securities, for example, a corporation may be forced as a practical matter or by agreement to pay a premium to the holder of its debt upon premature termination because the interest rate prevailing for similar securities has decreased, and such premium is necessary to compensate the investor for his loss of future interest in the favorable security. Such a premium is deemed an interest adjustment or a cost of borrowing money and, on this basis, is deductible as a business expense. See *General American Life Insurance Co.*, 25 T.C. 1265 (1956).

In *San Joaquin Light & Power Corporation* v. *McLaughlin, supra*, the court allowed the redemption premium to be deducted upon the following reasoning (pp. 679, 680) :

The amount paid to redeem the bonds, of course, would be determined by the agreement between the taxpayer and the bondholder made at the time of redemption, * * *. At the time of redemption the bondholder is paid the par value of the bond so that he is in effect paid for the use of the money he lent the amount of the discount (both amortized and unamortized), which the taxpayer suffered at the time of issue in 1920; he is also paid a premium for the privilege of anticipating the maturity of the bond in 1922. Both the discount in 1920 and *the premium paid in 1922 represent a part of the cost of the money procured* in 1920 by the sale of the * * * bonds. * * * [Emphasis supplied.]

See also *Olinger Mortuary Association*, 23 B.T.A. 1282 (1931).

There appears to be no reason to treat bond premium upon redemption in a different way in situations where there are stock conversion provisions, provided the deduction of the premium on redemption is limited to bond premium and no deduction is allowed for premium paid in relation to the stock conversion provisions. To allow the latter would be contrary to the provisions of section 311(a)(2) as implemented by regulations section 1.311–1(a).

While not here applicable because it relates to the holder rather than the issuer, a clear example of the distinction in principle between types of premiums is the amendment to section 125 of the 1939 Code and the statement in relation thereto in the applicable Senate report. The section, which was applicable to amortizable bond premium, was amended by section 217 of the Revenue Act of 1950 to include the following:

In no case shall the amount of the bond premium on a convertible bond [which may be amortized] include any amount attributable to the conversion features of the bond.

This amendment was incorporated in section 171(b)(1) of the 1954 Code.

The reason for this distinction between premiums, disallowing a deduction for that portion paid for the conversion feature of the bonds was stated in S. Rept. No. 2375, 81st Cong., 2d Sess., p. 47 (1950), 1950–2 C.B. 517, as follows:

Section 125 was intended primarily to deal with the case where the premium was paid because the security bore a stated rate of interest higher than that prevailing in the current market for securities of a like risk and a similar life. Equity required the allowance of a deduction against ordinary income in cases of such sort.

However, a premium may also arise because the security purchased is convertible into another type of security. Here the premium paid may represent nothing more or less than a portion of the price paid for the security into which the bond is convertible, and the allowance of a deduction for a premium of this type is no more justifiable than it would be for the balance of the cost of the investment. Nevertheless, since no distinction was made in the drafting of section 125 of the Code between premiums based upon the payment of an unusually high rate of interest and premiums based upon a conversion privilege, doubt arose concerning the availability of the amortization privilege with reference to premiums of the latter type. This question was resolved by the United States Supreme Court in the Korell and Shoong cases, decided on June 5, 1950. These cases involved the purchase of bonds at a substantial premium which was obviously based primarily upon the privilege of conversion into common stock. Since the securities were callable within the taxable year, the taxpayer's deduction of the difference between the purchase price and the call price in the taxable year when the bonds were purchased was sustained by the court. This results in a loophole since the effect is to grant the taxpayer a deduction against ordinary income equal to the amount of the premium paid for the conversion privilege, * * *.

The reasoning above is clearly applicable to the present situation. Allowing a corporation to deduct the premiums which it pays for the conversion feature of its debt is no more justifiable than allowing the corporation to deduct the cost of stock purchased from deceased or retiring shareholders. Petitioner may not adjust its capital structure under the guise of debt retirement and seek to have the Government help to pay the expense. We would be blinded by form over substance if petitioner were allowed to do indirectly what the Code specifically prohibits it from doing directly.

The decision of the Supreme Court of the United States in *Commissioner* v. *Korell*, 339 U.S. 619 (1950), does not require a different conclusion. That case arose under section 125 of the 1939 Code allowing the amortization of "bond premiums" by investors who purchase bonds at a premium. The taxpayer in that case paid a premium on the purchase of convertible securities which was directly attributable to the conversion privilege of the securities, and claimed the right to amortize the entire premium. The Supreme Court approved.

The Court, however, while recognizing the distinction between an interest-adjusting premium and a premium paid for a conversion privilege was limited to the specific provisions of section 125 which

made no such distinction. The Court further held that no such distinction could even be inferred inasmuch as it was found from the legislative history of the section that convertible bonds were not intended to be excluded from the operation of the section. Within the above limitations, the Court could not find a basis other than to hold that bond premium under section 125 encompassed all amounts paid in excess of the face value. The 1950 amendment to section 125 discussed *supra* was a direct result of this decision.

Unlike the *Korell* case, where the Court was limited to the specific section of the Code, we are confronted here with a regulation which must be interpreted in the light of the congressional intent as evidenced from the Code sections in the area. The specific disallowance of any amount paid "with respect to its stock" in section 311(a) coupled with the recognition of a distinction between the purpose and effect of different types of premiums, and the necessity for apportionment, as shown by section 171, formulates a sufficient basis upon which to require a limitation on the premiums allowed to be deducted under the regulation in issue to that portion which is not directly attributable to the conversion feature of the note.

We hold, therefore, that, under section 1.61–12(c)(1), Income Tax Regs., the deduction of any premium directly attributable to the conversion feature of the notes in issue may not be allowed inasmuch as this amount must be disallowed under section 311 as implemented by section 1.311–1(a), Income Tax Regs.

*Baltimore Steam Packet Co.* v. *United States*, 180 F. Supp. 347 (Ct. Cl. 1960), does not require a contrary view since the securities there in question had no convertible features.

We conclude, accordingly, that petitioner is not entitled to a deduction for any premium in excess of the call price.

*Decision will be entered under Rule 50.*