## UNITED GAS IMPROVEMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8257.

Circuit Court of Appeals, Third Circuit.

Argued May 4, 1943.

Decided March 31, 1944.

William R. Spofford, all of Philadelphia, Pa. (John H. Minds and Ballard, Spahr, Andrews & Ingersoll, all of Philadelphia, Pa., on the brief), for petitioner.

Ray A. Brown, of Washington, D. C. (Samuel O. Clark Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The United Gas Improvement Company (hereinafter referred to as "U.G.I.") has petitioned for a review of a decision of the Tax Court sustaining a deficiency determination by the Commissioner of Internal Revenue with respect to the petitioner's income tax liability for the year 1937. For the most part the material facts were stipulated below and, in any event, no dispute of fact is present. Except for one error in the taxpayer's return, which it concedes, the deficiency determination was the result of the Commissioner's disallowance of certain deductions which the taxpayer took for 1937 under the following circumstances.

On January 1, 1937, U.G.I. was the owner of all of the outstanding preferred

and all but 165.6 shares of the 16,000 outstanding common shares of the capital stock of Nashville Gas and Heating Company, a Tennessee corporation, (hereinafter referred to as "Nashville"). It also owned $37,000 par value of the $1,954,000 of Nashville's outstanding first mortgage bonds, of which U.G.I. was the guarantor, and $40,000 par value of Nashville's $775,000 of unguaranteed first mortgage bonds. In addition, Nashville was indebted to U.G.I. for loans made from time to time prior to 1937, in the aggregate sum of $522,225. This debt was unsecured and no interest had been paid thereon from June 30, 1934.

On July 5, 1935, Nashville had filed a petition in the appropriate United States District Court for reorganization under Sec. 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. A plan of reorganization was filed therein on September 20, 1935, which failed to receive court approval because of objections from certain owners of Nashville's unguaranteed bonds. A subsequent plan, which was filed on March 16, 1936, was approved by the court on June 11, 1937. (A presently immaterial modification was approved by the court on June 21, 1937.) The provisions of the approved plan were fully carried out and effectuated by December 31, 1937, and a formal decree so determining and further declaring the proceeding to be terminated was entered by the court on April 11, 1938.

The plan, as approved, provided that, upon U.G.I.'s paying to the trustee under the mortgage securing Nashville's outstanding bonds, a sum sufficient to pay off at par such of said bonds (and unpaid coupons) as were guaranteed by U.G.I., the latter would be entitled to receive all of the capital stock (20,000 shares of common, par value $100 per share) of the reorganized company. The unguaranteed bonds of the debtor were to be exchanged for new bonds of the reorganized company on a dollar for dollar basis; the holders of the debtor's outstanding preferred and common stock were not to "receive any distribution of cash or securities on account of the shares" held by them; and Nashville's liability for the unsecured loans from U.G.I. was to be cancelled, for which U.G.I. was not to "receive any distribution of cash or securities on account of such loans". The claims of other unsecured creditors of the debtor were to be unaffected by the plan.

As already stated, all of the provisions of the plan were completely carried out in 1937. Thus, on April 23, U.G.I. paid the trustee in the mortgage securing Nashville's bonds $1,964,925, the sum necessary to redeem the outstanding guaranteed bonds, with coupons to maturity, except for the bonds held by U.G.I. That sum was duly disbursed by the trustee to the holders of the guaranteed bonds; and, on or about August 25, Nashville issued to U.G.I. its entire new capital stock consisting of 20,000 shares of common. About the same date, Nashville issued new first mortgage bonds in the face amount of $775,000 in exchange for the old unguaranteed bonds. U.G.I. surrendered its rights as the holder of Nashville's old preferred and common stock; and the debt due by Nashville to U.G.I. was cancelled.

In its income tax return for 1937, U.G.I. deducted as a loss the cost of its investment in Nashville's old preferred and common stock and deducted, as a bad debt, the cancelled unsecured indebtedness formerly owing by Nashville. The Commissioner disallowed these deductions, and determined a deficiency accordingly, on the ground that the reorganization of Nashville under Sec. 77B of the Bankruptcy Act was a recapitalization of the debtor, and, as such, constituted a reorganization as defined by Sec. 112(g) (1) (D) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 858, and that U.G.I., as a part of the reorganization, had exchanged its holdings of Nashville's old preferred and common stock and the indebtedness owing by Nashville as part of the consideration for the reorganized company's new capital stock which U.G.I. received, and that, because of this exchange, no loss to U.G.I. was to be recognized under Sec. 112(b) (3) of the Revenue Act. The Tax Court (three members dissenting) upheld the Commissioner's determination.

It is of course obvious that, if the literal provisions of the plan are to be taken as conclusively reflecting what actually took place, U.G.I. received nothing in the reorganization for its holdings of Nashville's old preferred and common or the indebtedness due it by Nashville. According to the plan, the new stock of the reorganized company, which U.G.I. received, it received as consideration for supplying the funds necessary to pay off Nashville's old guaranteed bonds. However, we are dis-

posed to agree with the Tax Court that the reorganization of Nashville was one integrated transaction for the purpose of eliminating Nashville's funded indebtedness to the extent that U.G.I. was already liable therefor as guarantor and of discharging also the unsecured indebtedness due U.G.I. while preserving to U.G.I. the ownership of the entire equity in the property, just as it had been owned prior to the reorganization (save for a negligible common stock interest to which we shall refer later). We think the undeniable facts fully justify this conclusion.

On December 31, 1936, approximately three months before the later approved plan of reorganization was filed, the balance sheet of Nashville showed assets of $6,294,854.15 and liabilities (exclusive of capital stock) of $4,035,297.51, leaving a book value for Nashville's preferred and common stock of $2,259,556.64. This was the stock which the petitioner contends was given up for nothing a few months later under the plan of reorganization. On the day the plan was approved by the court (June 11, 1937) Nashville, with the approval of the Tennessee Railroad and Public Utilities Commission, wrote down its plant, property and equipment accounts by the aggregate sum of $1,665,785.33. On December 31, 1937, after the provisions of the plan of reorganization had been entirely consummated (except for the formal order terminating the proceeding), Nashville's balance sheet showed assets of $4,578,907.89 and liabilities (exclusive of capital stock) of $1,268,629.64, leaving a book value for Nashville's new (common) capital stock of $3,310,278.25. This was after the value of the plant, property and equipment accounts had been written down by $1,665,775.33, as above stated. Making due allowance for U.G.I.'s contribution for the payment of Nashville's guaranteed bonds (and the $37,000 worth of such bonds which U.G.I. surrendered), all of which had been eliminated as a liability of Nashville, and adding back the amount of the unsecured debt due U.G.I., the cancellation whereof had also been given effect on Nashville's books in 1937, there was still an equity for Nashville's capital stock of approximately $800,000 after the consummation of the reorganization.

On the basis of the foregoing, it can hardly be questioned that the new common stock which U.G.I. received as a result of the reorganization had a book value of approximately $800,000, over and above the effect of U.G.I.'s payment of Nashville's guaranteed bonds and the cancellation of the debt, and that the old preferred and common stock which U.G.I. gave up in connection with the reorganization must have had a relatively commensurate value. The Tax Court was therefore justified in ascribing the value of the old preferred and common stock as the consideration which U.G.I. gave in exchange for the new common stock of Nashville. Unless it be so considered, U.G.I. must be held to have given up an equity of large value in Nashville for nothing. Yet, it actually did not give up anything. The reorganization made no change in the ownership of Nashville except for the elimination of the outside 1.03% common stock interest whereby U.G.I. certainly did not suffer any diminution of its ownership interest.

■■ Actually, the reorganization was a recapitalization and, therefore, a reorganization within the meaning of that term as defined by Sec. 112(g) (1) (D) of the Revenue Act of 1936, c. 690, 49 Stat. 1648. While neither this statutory provision nor its interpretive regulation (Treasury Regulations 94, Art. 112(g)-2) specifically defines "recapitalization", it has been correctly said that the term as employed in this connection "may generally be taken as signifying (a) an arrangement whereby the stock, bonds or other securities of a corporation are readjusted as to amount, income or priority, or (b) an agreement of all stockholders and creditors to change and increase or decrease the capitalization or debts of the corporation or both." 3 Merten's Law of Federal Income Taxation, Sec. 20.78. And that well describes precisely what was done in the instant case. In Commissioner v. Neustadt's Trust, 2 Cir., 131 F.2d 528, where an exchange of debentures of a certain type for convertible debentures in the same company of shorter term and lesser interest rate was held to be a recapitalization within the meaning of Sec. 112(g) (1) (D), the court said (page 530 of 131 F.2d) that "a broad rather than a restricted meaning" is to be ascribed to the word "recapitalization" and that "the purpose of the statutory nonrecognition of gain or loss from reorganization transactions", as indicated by the legislative history which the court cited, was in part "to prevent losses being established by bondholders, as well as stockholders, who have received the new securities without

substantially changing their original investment." Cf. also Kistler v. Burnet, 61 App.D.C. 135, 58 F.2d 687; Haass v. Commissioner, 29 B.T.A. 900.

■ That the Nashville transaction qualified as a reorganization in connection wherewith no gain or loss was to be recognized is confirmed by the continuity of the economic interests in the debtor company despite the reorganization. From what we have already pointed out, it seems clear that U.G.I.'s economic interest in Nashville continued uninterrupted throughout. After the reorganization, just as before, U.G.I. was the substantial owner of Nashville.

Continuity of ownership of a business enterprise following its reorganization, as a test for determining whether the reorganization was such as calls for the non-recognition of gain or loss in connection therewith, is reflected in a number of decisions by the Supreme Court both where there was not a continuity of ownership interest, and therefore not a reorganization, as well as where there was such continuity, and consequently a reorganization. See Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 182, 62 S.Ct. 540, 86 L.Ed. 775; Palm Springs Holding Corporation v. Commissioner, 315 U.S. 185, 189, 62 S.Ct. 544, 86 L.Ed. 785; Le-Tulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 84 L.Ed. 355; Helvering v. Minnesota Tea Co., 296 U.S. 378, 386, 56 S.Ct. 269, 80 L.Ed. 284; John A. Nelson Co. v. Helvering, 296 U.S. 374, 377, 56 S.Ct. 273, 80 L.Ed. 281; Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 468, 53 S.Ct. 257, 77 L.Ed. 428. See also Commissioner v. Gilmore's Estate, 3 Cir., 130 F.2d 791, 794, 795; and Helvering v. New Haven & S. L. R. Co., Inc., 2 Cir., 121 F.2d 985, 987, certiorari denied 315 U.S. 803, 62 S.Ct. 631, 86 L.Ed. 1203. The legislative history of the statutory prescription now under consideration confirms the congressional intent to cover reorganizations where " * * * the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested * * *." See H. Rep. No. 704, 73rd Cong., 2d Sess., p. 13 (1939—1 Cum.Bull. (Part 2) 554, 564). While that report was filed by the Ways and Means Committee in connection with the Revenue Act of 1934, the cognate provisions of the Revenue Act of 1936 are not materially different.

Such is the situation in the instant case. U.G.I.'s money (of course, in increased amount) is still tied up in the same property in which it was originally invested. The only substantial changes that took place because of the reorganization were that U.G.I. paid off the Nashville bonds which it had guaranteed and cancelled the unsecured debt due it by Nashville; and the common stock interest of 1.03% in the old company, outstanding in the hands of others than U.G.I., was eliminated. In substantial effect, the cancellation of the debt was but a contribution by the sole owner of the reorganized company to the capital of the company. See United States ' v. Oregon-Washington R. & Nav. Co., 2 Cir., 251 F. 211, 212. By just so much as U.G.I. thus contributed was its stock interest in the reorganized company benefited. And the same is equally true as to U.G.I.'s contribution for the redemption of Nashville's guaranteed bonds.

As to the elimination of the 1.03% old common stock interest in the company, the petitioner argues that that very fact prevents ascribing any value to the common stock which U.G.I. surrendered in fulfillment of the plan. Otherwise, argues the petitioner, the plan would have been unfair and discriminatory in its treatment of the common stockholders, for the 1.03% outside common stock interest received nothing. But the argument overlooks the fact that, when U.G.I. paid off Nashville's guaranteed bonds, it had a right of subrogation against Nashville's assets prior to the rights of stockholders. And had the large debt owing by Nashville to U.G.I. not been cancelled, it would also have been ahead of the stock. Manifestly, therefore, the 1.03% common stock interest was of relatively small value. In any event the petitioner's point, based on the necessity of equality of treatment of all holders of securities of the same class, is presently no more than argumentative. Our present concern is not whether the plan was fair and reasonable. The question here is whether U.G.I. actually exchanged securities for securities in connection with the reorganization of Nashville. The Tax Court has found that it did, wherefore, in virtue of Sec. 112(b) (3) of the Revenue Act, no gain or loss to U.G.I. is to be recognized from the transaction.

■ It is the Commissioner's contention that the provisions of the plan for Nashville's reorganization are to be considered

aggregately as integral parts of one transaction, citing in support thereof Helvering v. Alabama Asphaltic Limestone Co., supra, and other cases.[1] Thus, the Commissioner argues that value is to be ascribed to the old preferred and common stock and that U.G.I. surrendered such stock in exchange for the capital stock of the reorganized company. The petitioner concedes the rule, as to the unity of the plan, which the Commissioner cites but asserts that it is without present bearing as the petitioner does not contend that the provisions of the plan are to be considered or given effect piecemeal. What the petitioner urges is that the plan, as approved by the court, conclusively established certain facts which no one may now deny or interpret otherwise than as stated in the plan. We do not think any such pervasive effect is to be given the statements contained in the plan merely because it was approved as being fair and reasonable to all interests affected thereby. That is what the bankruptcy court determined. But it did not thereby conclude what the tax effect of the steps taken under the plan might be. Nor did it assume to do so. In fact, any such effect so far as the debtor company was concerned was expressly excepted by the plan. That the plan was fair and reasonable as the bankruptcy court adjudged, no one now disputes. But, so far as the present tax question is concerned, whether U.G.I. surrendered its preferred and common stock in Nashville in exchange for the capital stock of the reorganized company depends upon what the actual facts of the situation disclose rather than upon what the plan purported to stipulate in such regard. The question was an open one before the Tax Court and having there been determined, upon substantial evidence, adversely to the petitioner, the finding in such regard is conclusive here. Wilmington Trust Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 86 L.Ed. 1352. It follows, therefore, under Sec. 112(b) (3) that no gain or loss to U.G.I. is to be recognized in the transaction.

■ Nor is it of any significance that the reorganization took place in a 77B proceeding. In Helvering v. Cement Investors, Inc., 316 U.S. 527, 62 S.Ct. 1125, 1126, 86 L.Ed. 1649, certiorari was granted "because the application of § 112(b) (5) [of the Revenue Act of 1936] to receivership or bankruptcy reorganizations raised important problems in the administration of the income tax law." And the exchange of securities in that case, which resulted from a plan of reorganization in a 77B proceeding, was held to meet the requirements of a reorganization under Sec. 112 (b) (5). Again, in Helvering v. Alabama Asphaltic Limestone Co., supra, a reorganization which grew out of an involuntary proceeding in bankruptcy was held to be within the reorganization provisions of Sec. 112(i) (1) of the Revenue Act of 1928, the Supreme Court there saying, at page 184 of 315 U.S., at page 544 of 62 S. Ct., 86 L.Ed. 775, that "Insolvency reorganizations are within the family of financial readjustments embraced in those terms ["merger" and "consolidation"] as used in this particular [1928] statute." We can see no reason why the recapitalization in the instant case was any less a reorganization, within the contemplation of Sec. 112 of the Revenue Act of 1936, merely because it evolved in a 77B proceeding.

The decision of the Tax Court is affirmed.

---

[1] Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Ahles Realty Corporation v. Commissioner, 2 Cir., 71 F.2d 150; Hazeltine Corporation v. Commissioner, 3 Cir., 89 F.2d 513; Diescher v. Commissioner, 3 Cir., 110 F.2d 90; Love v. Commissioner, 3 Cir., 113 F.2d 236.