**HEAD SKI COMPANY, Incorporated**

v.

**UNITED STATES of America.**
**Civ. A. No. 20123–W.**

United States District Court,
D. Maryland.

March 23, 1971.

Edward S. Smith, Albert S. Barr, III, Diana G. Motz, and Paul V. Niemeyer, Baltimore, Md., for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., George Beall, U. S. Atty., and John G. Sakellaris, Asst. U. S. Atty., Baltimore, Md., Edward J. Snyder, Donald R. Anderson and David A. Wilson, Jr., Attys., Dept. of Justice, Washington, D. C., for defendant.

WATKINS, District Judge:

This case comes before the court on motion and cross-motion for summary judgment. After a hearing on the motions and the submission of supplementary memoranda by both parties, this court finds that there is no genuine dispute between the parties as to any material fact, and that the plaintiff, Head Ski Company, Incorporated (Head Ski) is entitled to judgment against the United States as a matter of law.

The facts are briefly stated. Head Ski is a corporation incorporated under the laws of Delaware but with its principal place of business in Maryland. In June of 1963 it sold to Utilities Management Corporation two notes and a common stock warrant for an aggregate price of $700,000. The instant litigation is concerned with one of those notes—the $400,000 Junior Convertible Note. By its terms, this note required Head Ski to pay interest quarterly at 5¾ per cent per annum, allowed no prepayment on the $400,000 until April 30, 1968, and required the entire principal amount to be paid on May 1, 1973. By the note's convertible feature, the holder had the right to convert all or part of the note into Head Ski common stock at any time at the rate of $13.33⅓ per share of the 30,000 shares Head Ski had reserved for the possible conversion (an adjustment was made to this price and on the number of reserved shares after a three for one stock split in July of 1964). In 1964, Head Ski management determined it was in the company's best interests to pay off both notes, and after negotiation with Utilities Management Corporation, and with a loan from the Chemical Bank of New York Trust Company, it paid $930,000 for the Junior Convertible Note on December 9, 1964. On that

date, the stock was being quoted on the National Daily Quotation Service at a bid price of $30.00 per share and an asked price of $35.50 per share.

In its income tax return for the fiscal year ended April 24, 1965, plaintiff deducted the premium of $530,000 paid to retire the note and also the $55,515.43 unamortized balance of the bond discount and expenses attributable to the note as of December 9, 1964. The Commissioner of Internal Revenue disallowed the deductions and assessed a deficiency against the plaintiff for the taxable fiscal year ended April 24, 1965 of $289,090.20 with interest of $42,916.03. The plaintiff paid the total assessment of $332,006.23 on January 9, 1968. On February 23, 1968, plaintiff filed a claim with the District Director of Internal Revenue for a refund of the $332,006.23 together with interest from January 9, 1968, and, having had no response to the claim, filed the instant suit under 28 U.S.C. section 1346 on November 21, 1968.

The Government now concedes that the $55,515.43 unamortized balance of the bond discount and expenses attributable to the note was properly deductible by plaintiff in the taxable fiscal year ended April 24, 1965. The only issue remaining is whether the $530,000 premium paid to retire the Junior Convertible Note was a deductible item.

Head Ski claimed this deduction under 26 U.S.C. section 162(a) which allows deductions for ordinary and necessary business expenses. In 1965, Treasury Regulation 1.61–12(c) (1) supplemented section 162(a). It provided:

"(c) *Sale and purchase by corporation of its bonds.*—(1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year. If, however, the corporation purchas-

es any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is income for the taxable year."
Under (c) (5) of Treasury Regulation 1.61–12, debentures, notes, certificates or other evidences of indebtedness issued by a corporation and bearing interest were to be given the same treatment as bonds for the purposes of this regulation.

The Government contends that the amount paid by plaintiff for redemption of the note was a non-deductible capital expenditure since any premium plaintiff paid for the redemption was attributable to the increase in value of Head Ski stock into which the note was convertible. It bases its argument on the convertible feature of the note and says that Treasury Regulation 1.61–12(c) (1) did not contemplate a deduction for a premium paid to redeem a convertible note but only a deduction for a premium paid to redeem a bond or note without the convertible feature. The Government urges that the premium paid was not for the purpose of retiring a debt, but was for a stock purchase—a capital expenditure.

The cases, however, do not support the Government's argument. There appear to be only three cases construing the regulation as it relates to the deductibility of the premium paid to redeem a convertible debenture or note. They will be discussed chronologically.

In Roberts & Porter, Inc. v. Commissioner of Internal Revenue, 307 F.2d 745 (7th Cir. 1962) the taxpayer redeemed forty (at a total face value of $40,000) of its convertible notes for $117,763.20. The Commissioner did not allow the deduction plaintiff claimed of the $77,763.20 it paid in excess of the issuing price. The court found the deduction allowable and on page 747 of the opinion said:

"In our opinion, the plain and ordinary meaning of Regulation 1.61–12 (c) (1) dictates that Roberts & Porter be allowed its deduction for the dif-

ference between the issuing price and the price paid to purchase and retire the notes held by the Adams estate. These notes were not, in fact, converted into stock and the stock then sold. There is no provision in the Code or the Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege. The Regulation here involved is a long standing one, of whose existence Congress is fully aware. Roberts & Porter remind us that when, in 1950, Congress amended the Internal Revenue Code, 26 U.S.C.A. §§ 113, 125 to eliminate amortization of bond premiums, attributable to the conversion feature of convertible bonds, by the holders of such bonds [see Commissioner of Internal Revenue v. Korell, 339 U.S. 619, 70 S. Ct. 905, 94 L.Ed. 1108 (1950)] Congress did not, then or later, eliminate or limit the deduction by an issuing corporation of such part of any premium, attributable to a conversion feature, which the corporation may have paid when repurchasing its own bonds. If this situation represents a breach in our revenue wall, its repair must be effected by legislative action rather than by judicial interpretation."

Universal Tractor-Equipment Corp. v. United States, 67.1 U.S.T.C., ¶ 9409 (E. D.Va., 1967) held that the convertible promissory notes with which that litigation dealt were a "bona fide indebtedness"—not "an equity interest in the plaintiff" and the premium paid for their redemption was a deductible business expense under Treasury Regulation 1.61–12(c) (1). In that case the notes were not only convertible into the stock of the issuer but contained a "buy back" feature whereby the corporation was obligated to buy the stock back after conversion. The court found that the "buy back" feature did not alter the nature of the notes because the purpose of the feature was to prevent the holders from gaining an equity interest and control of the corporation. The court differentiated between a stockholder and a creditor and found that the holders were creditors and took no real risk on their investment as did stockholders of the corporation.

The last case in the trilogy is Southwest Grease and Oil Company, Inc. v. United States, 435 F.2d 675 (10th Cir., 1971). The appellate court in a per curiam opinion affirmed the trial court's holding that the convertible feature of the debentures which were redeemed did not prevent those debentures from being debts for the purposes of Treasury Regulation 1.61–12(c) (1). It held that the premium paid for the debentures' redemption was properly deductible under the regulation.

It should be noted that effective April 22, 1969, section 249 of Title 26 U.S.C. specifically covers deductions for premiums paid for the redemption of convertible notes. It reads in pertinent part:

"§ 249. *Limitation on deduction of bond premium on repurchase (a) General rule.*—No deduction shall be allowed to the issuing corporation for any premium paid or incurred upon the repurchase of a bond, debenture, note, or certificate or other evidence of indebtedness which is convertible into the stock of the issuing corporation, or a corporation in control of, or controlled by, the issuing corporation, to the extent the repurchase price exceeds an amount equal to the adjusted issue price plus a normal call premium on bonds or other evidences of indebtedness which are not convertible. The preceding sentence shall not apply to the extent that the corporation can demonstrate to the satisfaction of the Secretary or his delegate that such excess is attributable to the cost of borrowing and is not attributable to the conversion feature."

The enacting statute, section 414(c) of the Tax Reform Act of 1969, P.L. 9–172, 83 Stat. 613, gives the effective date of the Act and also admonishes the reader that no inference should be drawn from the fact that section 249 does not apply

to repurchases or redemptions of convertible notes prior to the effective date.

"*(c) Effective Date.*—The amendments made by this section shall apply to a convertible bond or other convertible evidence of indebtedness repurchased after April 22, 1969, other than such a bond or other evidence of indebtedness repurchased pursuant to a binding obligation incurred on or before April 22, 1969, to repurchase such bond or other evidence of indebtedness at a specified call premium, but no inference shall be drawn from the fact that section 249 of the Internal Revenue Code of 1954 (as added by subsection (a) of this section) does not apply to the repurchase of such convertible bond or other convertible evidence of indebtedness."

From both the House Report and the Senate Report on the Tax Reform Act of 1969, 1969 U.S.Code Congressional and Administrative News at pages 1759–1760 and 2181–2182, it is apparent that Congress was aware of the cases construing Treasury Regulation 1.61–12(c)(1) in a manner contrary to the position of the Internal Revenue Service, and that the intention of Congress was to enact legislation to change the law prospectively. Although both Reports speak of clarifying the treatment of premiums paid on repurchase, the courts that had dealt with the treatment found the regulation quite clear. This court does draw no inference from the effective date of the new statute—indeed the code as it was supplemented by Treasury Regulation 1.61–12(c)(1) in 1965, stands independent of the 1969 legislation. This court does agree with the cases that have construed the regulation and finds that the premium paid to redeem the note in the instant case was a deductible expense under the regulation.

The defendant urges that the Supreme Court decisions in the recent companion cases, Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970) and United States v. Hilton Hotels, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970),

should control. Both cases involve the tax treatment accorded to appraisal litigation expenses. In *Woodward* the taxpayers owned or controlled a majority of the common stock in an Iowa publishing corporation. In 1960 the taxpayers voted their stock in favor of a perpetual extension of the charter of the corporation while a minority stockholder voted against its extension. Under Iowa law the stockholders voting for renewal of a charter are required to buy out the stockholder voting against it. The parties could come to no agreement as to the "real value" of the shares and the question was litigated in the state court. In 1963 the taxpayers expended over $25,000 for services of attorneys, accountants and appraisers for the litigation and attempted to deduct these expenses on their federal income tax returns as business expenses. In *Hilton* the facts were similar but concerned the provision under New York law that stockholders who object to a merger are entitled to be bought out and that when the merger is consummated, title to the stock of the objecting stockholder passes to the corporation. In *Hilton,* as in *Woodward,* the taxpayer claimed a business deduction for the expenses incurred in the ensuing appraisal litigation.

The Supreme Court held in both cases that the fees paid for the appraisal litigation should have been treated as part of the taxpayer's cost in acquiring the stock, thus a capital and not an ordinary business expenditure. The Court held that the standard to be applied for litigation expenses is no longer to be measured by the primary purpose of the litigation—a standard which had produced "a melange of decisions" which were not reconcilable—but the origin of the claim litigated. In both *Woodward* and *Hilton* the origin of the claim litigated was the acquisition of stock. This Court finds that the origin of the expense herein claimed as a deduction arose out of the retiring of a corporate debt, not the acquisition of stock, and that the premium paid to retire the debt was deductible under 26 U.S.C. section 162(a)

as supplemented by Treasury Regulation 1.62–12(c) (1) as it stood in 1965.

Judgment is therefore entered in favor of plaintiff, Head Ski Company, Inc. in the amount of $332,006.23, plus interest according to law from January 9, 1968, in accordance with 26 U.S.C. section 6611(b) (2).