SKAGGS COMPANIES, INC., FORMERLY SKAGGS DRUG CENTERS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1828-71. Filed November 7, 1972.

*J. Wendell Bayles*, for the petitioner.
*Joe K. Gordon*, for the respondent.

FAY, *Judge*: Respondent determined a deficiency in the income tax liability of petitioner for the taxable year ended January 2, 1969, in the amount of $18,640. The issues presented are (1) whether amounts paid to insure the conversion of preferred stock into common stock are nondeductible capital expenditures, or business expenses currently deductible under section 162,[1] and (2) if such payments are capital expenditures, are they amortizable.

### FINDINGS OF FACT

Some of the facts have been stipulated; they are so found and incorporated herein by this reference.

Petitioner Skaggs Companies, Inc. (hereinafter referred to as Skaggs or the company), is a corporation duly organized under the laws of the State of Delaware. Skaggs had its principal offices in Salt Lake City, Utah, at the time of the filing of the petition. Petitioner's Federal income tax return for the taxable year ended January 2, 1969, was filed with the Internal Revenue Service Center for the Western Region at Ogden, Utah.

Petitioner's common stock was first registered in November 1965, and it traded over the counter until June 1967, when it went on the American Exchange. The common stock consisted of two classes of one dollar ($1) par value common stock designated "common stock" and "Class B common stock." As of May 8, 1968, the annual dividend on the common stock was $0.44 per share and there was no dividend on the class B common stock.

By an offering accompanied by a prospectus dated November 10, 1965, petitioner issued and sold 200,000 shares of 5-percent cumulative convertible preferred stock at a price to the public equivalent to its $20 per share par value. As of May 8. 1968, the annual dividend on the preferred stock was $1 per share.

The preferred stock was redeemable at the option of the petitioner upon at least 30 days' notice at a redemption price of $21.50 per share if redeemed on or before November 15, 1970. The Certificate of Designations, Preferences, Rights and Limitations of the Common Stock and Cumulative Convertible Preferred Stock, a document which describes the rights of the various stockholders, provided for a sinking

---

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

fund to begin no later than December 31, 1975, to accomplish the eventual redemption of the preferred shares. However, it is clear from that document that there was never any requirement that the preferred stock be retired. That document reads in pertinent part—

7. Sinking Fund.—So long as any of the shares of Preferred Stock shall be outstanding, the corporation, as a sinking fund for the purchase or redemption thereof (hereinafter called the "Sinking Fund"), shall set aside in cash from the net earnings of the corporation for any preceding fiscal year or years, after full payment or provision for payment of all federal and state income and franchise taxes, and after full payment or provision for payment of all dividends in arrears and any current dividend on the shares of Preferred Stock, commencing no later than December 31, 1975, and on or before the same date in each year thereafter (hereinafter called the "Sinking Fund Payment Date"), a sum equal to the amount which would be necessary to redeem five per cent (5%) of the number of shares of Preferred Stock outstanding on December 31, 1975, at Twenty Dollars ($20.00) per share as of each respective Sinking Fund Payment Date.

*The Board of Directors may apply the amount in the Sinking Fund to the redemption price set forth in Section 6 above* or to the purchase of shares of Preferred Stock, at a price not to exceed such redemption price, and may credit the Sinking Fund with the amount employed in such redemption or purchase to the extent such redemption or purchase takes place after December 31, 1975. The Board of Directors may also credit the Sinking Fund with an amount equal to the excess of the redemption price which would have been payable had such shares been redeemed above the purchase price paid with respect to any shares of Preferred Stock so purchased after December 31, 1975. [Emphasis added.]

The company had an expansion program which required substantial amounts of capital. In order to provide additional working capital to aid petitioner's expansion and to increase its publicly owned position, Skaggs considered a plan to eliminate the preferred stock from its capital structure by in effect forcing the conversion of all of its preferred stock into common stock. By use of a conversion-redemption technique, Skaggs was able to entirely eliminate the preferred stock from its capital structure and avoid the problem of having to divert substantial amounts of cash to fund the preferred stock sinking fund. Furthermore, the sums expended to meet the preferred stock 5-percent dividends which amounted to approximately $200,000 per year in 1968 could be somewhat reduced by converting the preferred stock to common stock which paid a reduced dividend.

The company successfully accomplished the elimination of all its preferred stock before July 1, 1968, and no sinking fund was ever established.

A series of events preceded this task. On May 7, 1968, the petitioner's directors voted a 3-for-2 split of the common stock and class B common stock effective July 1, 1968, to shareholders of record June 17, 1968. Preferred stockholders who converted their shares received the additional common shares paid pursuant to the stock split. On or about

May 8, 1968, petitioner caused notice of redemption of the preferred stock to be published and to be mailed to all registered shareholders thereof. The holders of shares of preferred stock were informed in the notice of redemption that they could allow their shares to be redeemed at the redemption price of $21.64 per share, including accrued dividends, or they could convert their shares to common stock. Any preferred stock not presented for conversion prior to the close of business on June 4, 1968, would be redeemed.

The petitioner intended by its call for redemption of the preferred stock to secure the conversion of the preferred stock to common. The conversion ratio of 0.888 of a share of common stock for each share of preferred stock surrendered for conversion assured the preferred shareholders that conversion of preferred stock to common stock would be profitable as long as the market price on the common stock remained above $24.91. The lowest price of the common stock between May 8, 1968, and June 4, 1968 (the conversion period), was $33. Therefore, during the entire time of the conversion period it was more profitable for the holders of the preferred stock to convert the preferred stock to common stock and then dispose of the common stock than to redeem their preferred stock for cash.

The petitioner recognized that if for any reason during the time between May 8 and June 4, 1968, its common stock dropped below the price at which conversion was favorable petitioner would most likely be faced with the problem of expending in the neighborhood of $4 million to fulfill its commitment to redeem all of the preferred shares. To insure itself against such a hazard, the petitioner entered into a "Standby Agreement" with a group of investment banking firms headed by Merrill, Lynch, Pierce, Fenner & Smith, Inc. The agreement called for the investment banking firms, in consideration of a fee, to offer to purchase petitioner's preferred stock at a price in excess of the redemption price ($22.14). Said offer was to be made only prior to the close of business on June 4, 1968.

Any shares of preferred stock so purchased by the investment banking group were to be presented to the petitioner for conversion prior to the close of business on June 4, 1968.

The holders of preferred stock were notified on or about May 8, 1968, of their right to sell their preferred shares to the investment banking firms for $22.14 per share.

Since the agreement provided that the investment bankers would pay more for the preferred stock than the holders could receive by having their stock redeemed ($22.14 vs. $21.64), it virtually assured petitioner that it would not be required to pay out any sums for redemptions during the conversion period. Furthermore, since the market price of the common stock remained much higher than the

price at which conversion was profitable, the investment banking group was never called upon to purchase any preferred stock under the terms of the agreement.

Petitioner, under the terms of the agreement, paid to the investment banking group a total of $35,302.

The petitioner deducted this amount on its Federal income tax return for the taxable year ended January 2, 1969, as a business expense for professional services rendered. Respondent in his notice of deficiency increased petitioner's taxable income to reflect the disallowance of this deduction.

### OPINION

The issues are (1) whether an amount paid to insure the conversion of preferred stock into common stock is deductible as an ordinary and necessary business expense under the provisions of section 162 or is a nondeductible capital expenditure within the purview of section 263 and (2) if such payment is a capital expenditure, whether it is amortizable.

The petitioner formulated a plan to assure that its capital account would be restructured and its preferred stock converted into common stock. The specific expense at issue was incurred to insure that this result would be achieved risk free.

The petitioner's principal contention is that the expenditure was characteristic of insurance to protect against risk and like many other types of insurance should be deductible under section 162 as an ordinary and necessary cost of business. We do not agree with this contention.

The case law in this area does not consider the character of each individual expense as dispositive. Rather, the courts look to the nature of the underlying transaction upon which the expense in question was incurred. See, for example, *United States* v. *General Bancshares Corporation*, 388 F. 2d 184 (C.A. 8, 1968), and cf. *Transamerica Corporation* v. *United States*, 254 F. Supp. 504 (N.D. Cal. 1966), affd. 392 F. 2d 522 (C.A. 9, 1968).

In the present case, the investment bankers' fee was incurred solely to facilitate the conversion of the preferred stock of the petitioner. The petitioner's purpose for this capital restructuring was to free substantial amounts of working capital. In fact, without this "Standby Agreement" adverse market conditions at an inopportune time could have forced the petitioner to immediately spend upwards of $4 million in fulfilling its redemption obligations, and it remains unanswered whether the capital restructuring would have even been attempted without the insurance offered by the "Standby Agreement." The cost of the "Standby Agreement" was basically related to and an integral part of a plan intended to reshuffle the capital structure within the

framework of an existing corporation. The result of the reshuffling (preferred stock converted to common stock) was essentially a recapitalization.[2]

It is an established proposition that expenses related to a reorganization or recapitalization are not ordinary within the intendment of section 162. Such expenditures are "a part of the expenditure needed to give the corporation an intangible asset which we may call its altered corporate structure * * * [expenses which are] capital in nature." *Mills Estate* v. *Commissioner*, 206 F. 2d 244, 246 (C.A. 2, 1953). See also *Skenandoa Rayon Corp.* v. *Commissioner*, 122 F. 2d 268 (C.A. 2, 1941), affirming 42 B.T.A. 1287 (1940), certiorari denied 314 U.S. 696 (1941); and *Missouri-Kansas Pipe Line Co.* v. *Commissioner*, 148 F. 2d 460 (C.A. 3, 1945), affirming a Memorandum Opinion of this Court.

The petitioner also argues that the call for redemption eliminated the liability to fund a sinking fund and the expenditure is therefore within the ambit of a case such as *Roberts & Porter, Inc.* v. *Commissioner*, 307 F. 2d 745 (C.A. 7, 1962), reversing 37 T.C. 23 (1961). Petitioner's reliance on this theory is misplaced. That case relied on section 1.61-12(c), Income Tax Regs., and held that premiums paid by a corporation upon redemption of its convertible *debentures* were proper section 162 business expenses. See also *Head Ski Co.* v. *United States*, 323 F. Supp. 1383 (D.Md. 1971), and *Southwest Grease & Oil Co.* v. *United States*, 435 F. 2d 675 (C.A. 10, 1971).

The expense in question herein was not at all related to the type of situation found in the above cases and they are inapplicable for a number of reasons. Primarily, the deduction granted by the regulation is premised on the idea that the deductible premium is an amount which relates to the cost of borrowing money on a debt instrument, a premium akin to interest.[3] In the present case, there was no outstanding "debt" which was retired. The sinking fund would have been used to retire preferred stock, and preferred stock is an equity item. While preferred stock by its very nature embodies some of the protective features ordinarily associated with bonded indebtedness, in its traditional concept, it is nevertheless an instrument evidencing an investment of risk capital in a corporation. See *Warren* v. *King*, 108 U.S. 389 (1883); and *Crown Iron Works Co.* v. *Commissioner*, 245 F. 2d 357 (C.A. 8, 1957), affirming a Memorandum Opinion of this Court.

Furthermore, in the cases relied on by petitioner the premium was paid to retire the debt instrument. In the present case the preferred

[2] See *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942); *United Gas Improvement Co.* v. *Commissioner*, 142 F. 2d 216 (C.A. 3, 1944), affirming 47 B.T.A. 715 (1942), certiorari denied 323 U.S. 739 (1944); and sec. 1.368-2(e), exs. (2) and (4), Income Tax Regs.

[3] For a review of respondent's position on this issue, see Rev. Rul. 67-409, 1967-2 C.B. 62.

stock was not redeemed or retired; it was converted into another form of equity investment.

In the alternative, petitioner argues for amortization of the expense as follows: (1) The sinking fund would have been used for the redemption of the preferred stock by 1996 at the latest and the transaction involved herein eliminated the need for any sinking fund; (2) the transaction served the same purpose as accelerating the expense of funding the sinking fund and it placed the petitioner in the same position it would have been in in 1996 when the preferred stock was all redeemed; and (3) therefore, the useful life of this expense could not exceed 1996 and the expense should be amortized over the 27-year period between 1969 and 1996.

This argument is without merit. First, we note that there was no *requirement* that the preferred stock be redeemed by 1996 and consequently the preferred stock had an indeterminable life.[4]

Amortization in the present case is improper for an even more basic reason. The expenses herein were not related to the preferred stock; they were actually incurred on a plan which raised capital by the issuance of more common stock. It is elementary that an asset must have a determinable useful life upon which to base an amortization deduction, see *Winchell Co.*, 51 T.C. 657 (1969), and *Dunn* v. *United States*, 400 F. 2d 679 (C.A. 10, 1968), and capital acquired by the issuance of stock is "not [such] an exhaustible or depreciable asset." *Barbour Coal Co.* v. *Commissioner*, 74 F. 2d 163 (C.A. 10, 1934), affirming a Memorandum Opinion of the Board of Tax Appeals.

*Decision will be entered for the respondent.*

---

[4] Even if we assume that the preferred stock had a determinable life and that the expenses were related to that preferred stock, amortization is improper. In *Commissioner* v. *Commercial Investment Trust Corporation*, 74 F. 2d 1015 (C.A. 2, 1935), affirming per curiam 28 B.T.A. 143 (1933), it was held that expenses incurred in connection with the issuance of preferred stock which was to be retired were not deductible currently or ratably over the contemplated life of the stock.

