110 T.C. No. 30

UNITED STATES TAX COURT

FMR CORP. AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15711-94.                    Filed June 18, 1998.

P provides investment management services to
regulated investment companies (RIC's), which are
commonly referred to as mutual funds.  During the years
in issue, P incurred costs for developing and launching
82 new RIC's.  The expenditures incurred in launching
new RIC's were intended to, and did, provide
significant future benefits to P.

Held:  The expenditures are not currently
deductible under sec. 162(a), I.R.C., and must be
capitalized under sec. 263(a), I.R.C.

Held, further:  P failed to establish a limited
life for the future benefits obtained from the costs of
launching RIC's.  P may not amortize such costs under
sec. 167, I.R.C.

Leslie J. Schneider, Patrick J. Smith, Frederic G. Corneel, and Kenneth J. Seaman, for petitioner.

Steven R. Winningham, Martin L. Shindler, Marvis A. Knospe, and Tyrone J. Montague, for respondent.


RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1985 | [1]$111,905 |
| 1986 | 534,142 |
| 1987 | 99,042 |

[1]Respondent was granted leave to amend the answer, asserting that petitioner is liable for an increased deficiency for 1985 in the amount of $48,156. Thus, the total deficiency determined by respondent for 1985 is $160,061.

The issues for decision are: (1) Whether the costs petitioner incurred in starting new regulated investment companies during the years in issue are deductible as ordinary and necessary business expenses under section 162[1] or must be capitalized; and (2) if the costs are capital expenditures, whether petitioner is entitled to deduct an amortized portion of such costs under section 167.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner's Forms 1120, U.S. Corporation Income Tax Return, for the years in issue were filed with respondent's Service Center in Andover, Massachusetts. At the time it filed the petition in this case, petitioner's principal place of business was located in Boston, Massachusetts.

General Background

FMR Corp. is the parent holding company of an affiliated group of corporations. Hereinafter we shall refer to FMR Corp. as petitioner. Petitioner provides investment management services, through its operating subsidiary, Fidelity Management & Research Co. (FMR Co.), to regulated investment companies (or RIC's, which are commonly known to the investing public as "mutual funds") under a contract with each RIC. As of January 1, 1996, petitioner provided such services to 232 RIC's.

Petitioner began in 1946 as the investment adviser to a single RIC, the Fidelity Fund, which invested in stocks. For most of the following three decades, petitioner created and rendered services to additional RIC's, which also invested only in stocks. In the 1970's, petitioner began to create RIC's that invested in bonds (fixed income funds) and in short-term

corporate and governmental obligations (money market funds).
These RIC's began to attract the investing public, particularly
when coupled with a novel feature such as the checkwriting
feature of petitioner's money market fund.

By 1980, petitioner managed $8.2 billion of assets for 21
different RIC's.  At the beginning of 1985 (the first year in
issue), petitioner managed $35.8 billion in assets for 79 RIC's,
and by the end of 1987 (the last year in issue), petitioner
managed $71.8 billion for 140 RIC's.

Petitioner is the sole underwriter and distributor of the
shares in the RIC's that it manages in the Fidelity family.[2]
Petitioner divides its distribution functions between Fidelity
Distributors Corp. (FDC) and Fidelity Investments Institutional
Services Co. (FIIS), depending upon whether the shares in the
RIC's are sold directly to the public or to or through
institutions, respectively.  In accordance with this distribution
scheme, petitioner classifies the RIC's that it manages as either
retail funds; i.e., those the shares of which are directly
offered to the public, or institutional funds; i.e., those the
shares of which are offered to, or through large institutions,
such as financial planners, banks, insurance companies, or
employee plans.  The marketing efforts of the retail RIC's are

---

[2]The group of funds managed by a particular investment
adviser is known in the industry as that adviser's "family of
funds".

planned and executed by Fidelity Investments Retail Marketing Co. (Retail Marketing). The marketing efforts of the institutional RIC's are planned and executed by FIIS. In addition to marketing and distribution efforts on behalf of existing RIC's, Retail Marketing and FIIS are responsible for coordinating the establishment and introduction of new RIC's for retail and institutional distribution, respectively.

The majority of the funds managed by petitioner are retail funds. All except two of these retail funds are "open-end" funds, which means that shareholders in the RIC may redeem their shares upon demand at a price based upon net asset value. During the years in issue, many of the equity retail RIC's were "load funds", which means that the sale of shares in the RIC's was subject to a sales charge. Most of the institutional and all the fixed income and money market RIC's were "no-load" funds, not subject to a sales charge. During the years in issue, petitioner began to eliminate the load charge for most of the equity RIC's it managed, either temporarily or permanently.[3] Petitioner also expanded its "exchange privilege" so that a shareholder could redeem the shares in one RIC to purchase shares in another RIC in the Fidelity family incurring little or no additional load charge, depending upon whether the load on the purchased shares was greater or less than the load on the redeemed shares.

---

[3]Currently, most of the retail funds managed and advised by petitioner are "no-load" mutual funds.

Investment Disciplines of the RIC's

Each RIC offers a distinct investment discipline (or objective), or a distinct service feature (e.g., required minimum investment, checkwriting, etc.) different, to a greater or lesser extent, from every other RIC in the Fidelity family.  Although each RIC is different, the differences in the investment disciplines and objectives can be minor, such as the difference between a New York and New Jersey bond fund, or major, such as the difference between investing in low grade corporate securities and Treasury bills.  The investment disciplines and features are described in the offering prospectus for each RIC. Petitioner classifies the RIC's that it manages according to three general types of financial instruments the RIC invests in: Equity funds, money market funds, and fixed income funds.  Equity funds (also known to the public as "stock funds") are RIC's that invest in corporate stocks (equities).  The category of equity funds can be further subdivided into:  Growth funds, growth and income funds, international funds, asset allocation funds, and sector funds.  Typically, the stated investment discipline for a RIC in the equity group also permits investment in bonds and money market instruments.  Money market funds are RIC's that invest in money market instruments such as short-term corporate and governmental obligations.  Money market funds are subclassified into "taxable" and "municipal" (or "tax-free")

RIC's. Fixed income funds are RIC's that invest in corporate, Government, and municipal bonds. Fixed income funds are also subclassified into "taxable" and "municipal" RIC's. Petitioner's subsidiary, FMR Co., is the investment adviser/manager for all the RIC's in the Fidelity family.

Regulatory Background

Petitioner's activities in creating and managing RIC's are governed by the Investment Company Act of 1940 (the 1940 Act), ch. 686, tit. I, secs. 1 through 53, 54 Stat. 789-847, current version at 15 U.S.C. secs. 80a-1 through 80a-64 (1994). The 1940 Act regulates the creation and management of RIC's, which are separate investment companies under the 1940 Act. RIC's are formed as either domestic corporations, partnerships, trusts, or series within existing trusts. The activities of FMR Co. are governed by the Investment Advisers Act of 1940 (the Advisers Act), ch. 686, tit. II, secs. 201 through 221, 54 Stat. 847, 15 U.S.C. secs. 80b-1 through 80b-21 (1994), which regulates the registration and activities of investment advisers. Petitioner's activities in offering shares in the RIC's to the public are governed by the Securities Act of 1933, ch. 38, 48 Stat. 74, 15 U.S.C. secs. 77a through 77aa, which regulate the registration and issuance of securities.

Section 80a-8(a) of the 1940 Act requires any investment company to register with the Securities and Exchange Commission

(SEC). The 1940 Act permits one trust document to serve as the governing instrument for more than one RIC. Each additional RIC covered by a preexisting trust document is established as a separate "series" of that trust. In effect, the trust establishing one RIC can support any number of additional separate series RIC's.

RIC's are governed by a board of directors (or trustees) initially assembled by the RIC sponsor, who, like petitioner, is usually also the RIC adviser and the RIC distributor. After the selection of the initial board of trustees, vacancies on the board of trustees are filled by nominations from the board of trustees, subject to shareholder approval. In the case of RIC's established as separate series, they are automatically governed by the board of trustees of the preexisting trust.

The 1940 Act was passed, in part, to protect investors by regulating the potential conflict of interest arising from the fact that RIC's are typically created and managed by the investment adviser. Section 80a-10(a) of the 1940 Act regulates this type of potential conflict by requiring that a RIC's board of trustees consist of members no more than 60 percent of whom can be "interested persons of such registered company." A RIC has no employees, and its board of trustees oversees the investment adviser's activities to insure that the RIC's securities investments remain consistent with its investment objective, that the RIC's portfolio meets an acceptable level of

performance, and that the expenses paid by the RIC, including the investment adviser's management fee, are reasonable.

Section 80a-15(a) of the 1940 Act requires that management contracts between an adviser and a RIC have an initial term of 2 years, be renewable annually thereafter, and be terminable at will by the RIC's board of trustees upon 60 days' notice without penalty.  Under section 80a-15(c) of the 1940 Act, the initial management contract and all annual renewals must be approved by a majority of the independent directors/trustees, who must comprise no less than 40 percent of the entire board of trustees. Although a majority of the independent trustees must approve the initial management contract and all renewals, under the 1940 Act, a majority of the independent trustees cannot otherwise terminate a management contract unless they represent a majority of the entire board of trustees.  Notwithstanding the termination provisions of the 1940 Act, in the experience of the mutual fund industry, it is highly unusual for a management contract to be either terminated or not renewed by a RIC's board of trustees.

Prior to selling shares in a new RIC, section 80a-8 of the 1940 Act requires that the RIC be registered with the SEC. The SEC registration includes copies of the proposed management contract and all other material contracts executed on behalf of the RIC, as well as the offering prospectus, which includes a statement of the investment discipline or objective of the RIC. No one has the right to offer shares in a new RIC to the public

until: (1) The RIC is formed as either a domestic corporation, partnership, trust, or series within an existing trust; (2) the required 1933 Act SEC registration becomes effective; (3) the management contract is executed; and (4) the required 1940 Act registration of the investment company becomes effective.

The Board of Trustees

All the RIC's in the Fidelity family are governed by a common board of trustees, which meets monthly (except for August) in a special "boardroom" in petitioner's offices. Neither the board of trustees nor any of the RIC's it oversees have any employees or office facilities.

During the years at issue, the common board of trustees had 11 members (3 "interested" and 8 independent trustees). In exercising its fiduciary responsibilities to consider and approve each separate management contract, the board of trustees reviews the financial performance of each individual RIC. To assist the board of trustees in carrying out its responsibilities, FMR Co. compiles shareholder composition, financial, profitability, and other data on each RIC. It also compiles data on comparable RIC's and their performance, management fees, and expenses ratios. All these data are presented to the board of trustees for review. FMR Co. also prepares oral and, sometimes, videotaped presentations to highlight the data under review by the board of trustees.

For administrative convenience, the board of trustees considers renewal of the contracts with petitioner over a 3-month period, by general investment category, reviewing and renewing contracts to manage all equity funds (RIC's that invest in stocks) in a given month; all fixed income funds (RIC's that invest in Bonds) in another month; and all money market funds (RIC's that invest in commercial paper and other obligations) in another month. The common board of trustees for the RIC's in the Fidelity family has never exercised its right of termination or otherwise failed to renew a management contract with petitioner.

Between 1980 and 1995, FMR Co. has recommended, and the board of trustees has approved, the merging or closing of 23 RIC's. Of the 82 RIC's which were created during the years at issue, FMR Co. recommended, and the board of trustees approved, the merging of 6 retail RIC's and the closing of 2 institutional RIC's.

Prior to offering shares in a new RIC to the public, FMR Co. must obtain three different approvals from the board of trustees. The three board approvals involve: (1) Approval to create the RIC; (2) approval to register the new RIC with the SEC; and (3) approval of the initial management contract. When petitioner determines that a new RIC concept merits consideration by the board of trustees, petitioner prepares a memorandum to the board of trustees. Once petitioner receives the board of trustees'

approval, petitioner files the RIC's registration statement with the SEC.

During the years in issue, SEC registrations for RIC's became effective 60 days after filing. During this 60-day period, the SEC could submit comments and questions to petitioner concerning the registration. Unless the SEC issued a stop order, the registration became effective 60 days after filing.

At or before the time that the RIC's SEC registration would become effective, petitioner, by memorandum to the board of trustees, requested approval of the initial management contract. Petitioner submitted this memorandum to the board of trustees at a regularly scheduled meeting. Only after the board of trustees approved the initial management contract and the SEC registration became effective, could petitioner begin selling shares in the RIC to the investing public.

Petitioner's RIC's

During the years in issue, petitioner created, and entered into separate contracts to manage, 82 new RIC's. Each new RIC launched by petitioner is formed as a trust, or as a series of an already existing trust. The decision to create a new trust or a new series within an existing trust turns upon practical considerations like matching fiscal years or similarity of the new investment discipline or objective to those of preexisting

trusts.  A RIC formed as a separate "series" of an existing trust is, nevertheless, treated as a separate company under the 1940 Act and treated as a separate corporation under section 851(h).[4]

The RIC's created during the years at issue are governed by the trust instruments of 26 different Massachusetts business trusts.  During the years at issue, petitioner created two new trusts for two of the RIC's created.  The remaining 80 RIC's created during the years at issue were established as separate series within preexisting trusts.[5]

Since one trust may serve as the governing instrument for many separate RIC's, the trust document provides that the assets of the trust received for the issue or sale of shares of each RIC and all income, earnings, profits, and proceeds are segregated and allocated to such RIC and constitute its underlying assets. The underlying assets of a RIC are segregated on the books of account and are charged with the liabilities of the RIC and a share (based upon a proportion of the RIC's asset value) of the trust's general expenses.

---

[4]Sec. 851(h) applies to tax years beginning after Oct. 22, 1986.

[5]A Declaration of Trust permits the trustees to create additional RIC's to be governed by a given trust document.  The Declaration of Trust provides that in the event that FMR Co. ceases to act as investment adviser to the trust or RIC, the right of the trust or RIC to use identifying names, such as "Fidelity" or "Spartan", terminates.

In addition to executing an investment advisory and management contract (the management contract) with FMR Co., each RIC managed by FMR Co. executes contracts appointing Fidelity Service Co. (FSC) or Fidelity Investments Institutional Operations Co. (FIIOC), divisions of petitioner, as agent for the transfer of shares, recordkeeping and disbursements. Under separate contracts between the trusts (not each RIC within a given trust) and FDC, petitioner distributes and markets shares in all but three of the RIC's it manages.

After petitioner creates a new RIC, and prior to actually selling shares to the public, petitioner supplies the initial investment (seed money) for the RIC to establish the beginning portfolio. If the RIC is being established as a new trust, rather than as a series within an existing trust, the SEC requires petitioner to fund the RIC with $100,000 of seed money for at least 2 years. In practice, petitioner, through FMR Co. or its wholly owned subsidiary FMR Capital, seeds each new RIC with between $1 and $3 million (as needed to establish a diversified opening portfolio), and by so doing, petitioner acquires shares in, and thus an ownership interest in, the new RIC. As sole shareholder, petitioner votes to approve the initial directors (in the case of a new trust) and ratifies the management contract with itself. As the new RIC receives money from the public, petitioner begins to redeem its investment in the RIC. Petitioner attempts to redeem the seed money in an

orderly fashion, to avoid disrupting the portfolio.  Petitioner usually retains its seed money as an ownership interest in a given RIC until the interest is diluted, through purchases of shares by the public, to about a 10-percent stake.

Only the RIC's managed by petitioner, which comprise the Fidelity family, may be marketed under the Fidelity name. Although it is not uncommon for a shareholder to have shares in more than one Fidelity RIC, each of the RIC's in Fidelity's family of RIC's has a different and ever-changing stockholder composition; i.e., the ownership of each RIC is different from that of every other RIC in the Fidelity family.  The following table shows the number of RIC's and the total amount of assets in these RIC's for the years 1982 to 1995:

| Year | Number of RIC's | Assets Under Management (in billions) |
| --- | --- | --- |
| 1982 | 43 | $18.2 |
| 1983 | 48 | 21.4 |
| 1984 | 57 | 25.3 |
| 1985 | 79 | 35.8 |
| 1986 | 109 | 59.6 |
| 1987 | 140 | 71.8 |
| 1988 | 156 | 77.4 |
| 1989 | 162 | 98.9 |
| 1990 | 181 | 110.5 |
| 1991 | 184 | 144.3 |
| 1992 | 193 | 172.8 |
| 1993 | 204 | 237.7 |
| 1994 | 213 | 275.0 |
| 1995 | 232 | 373.3 |

Of the RIC's launched during the years in issue, those remaining in the same form as originally launched contained over $109 billion in assets as of 1995, or approximately 30 percent of the total assets under petitioner's management for that year.

Management Contracts

The provisions of the management contracts between each of the RIC's and FMR Co. are substantially identical, except for the actual management fees and other minor differences. FMR Co. utilizes two basic forms of management contract, Spartan and non-Spartan. Spartan RIC's pay an all-inclusive management fee, which fee is greater than the management fee paid by equivalent non-Spartan RIC's, in exchange for FMR Co.'s paying most of the RIC's expenses, including the transfer agent fees. Spartan RIC's require shareholders to open an account with a higher minimum investment than the non-Spartan RIC's.

In accordance with the individual contracts entered into between petitioner and the RIC's, each RIC pays a management fee to FMR Co. In Spartan contracts, the management fee is a fixed percentage of the average net assets of the RIC. In non-Spartan contracts, this fee consists of a group fee rate (payable in accordance with the schedule included in the management contract), an individual RIC fee rate, and, in the case of some equity RIC's, a performance fee. The group fee is based upon the monthly average of the net assets of all petitioner's proprietary

RIC's. The individual RIC fee is a fixed percentage of a monthly average of net assets. The performance fee is based upon a given RIC's performance measured against an industry index, such as the Standard & Poors 500, and the fee may increase or decrease depending upon whether the performance of the given RIC is higher or lower than the applicable index. The percentage used to calculate the management fee earned by petitioner from the 82 RIC's in issue was not the same for all 82 RIC's. However, all petitioner's management fees under the various contracts are dependent upon the amount of assets in each individual RIC.

## Terms of Contracts With Petitioner's Other Affiliates

Pursuant to a distribution agreement between the RIC and FDC, FDC must use all reasonable efforts to secure purchasers for the RIC's shares. FDC initially incurs the promotional and administrative expenses associated with the offer and sale of the RIC's shares. Pursuant to a transfer agent agreement, FSC acts as transfer, dividend disbursing, and shareholder servicing agent for the RIC. FSC receives annual account fees and asset-based fees for each retail account and certain institutional accounts based on account size. FSC also calculates the RIC's net asset value per share and dividends and maintains the RIC's accounting records, and in return, FSC receives pricing and bookkeeping fees for these services based upon the RIC's average net assets.

The following table shows petitioner's revenues for the years 1982 through 1995 from management and investment advisory fees, transfer agent and fund accounting fees, mutual fund commissions, and "other" (principally brokerage commissions):

Revenue ($1,000)

| Year | Management and Investment Advisory | Transfer Agent and Fund Accounting | Mutual Fund Commissions | Other | Total |
|------|------|------|------|------|------|
| 1982 | $77,900 | $23,700 | $20,900 | $32,600 | $155,100 |
| 1983 | 96,700 | 32,200 | 64,400 | 61,600 | 254,900 |
| 1984 | 123,500 | 39,600 | 57,400 | 41,300 | 261,800 |
| 1985 | 151,100 | 50,300 | 68,900 | 118,300 | 388,600 |
| 1986 | 251,853 | 102,228 | 238,546 | 225,161 | 817,788 |
| 1987 | 381,091 | 179,435 | 228,526 | 294,926 | 1,083,978 |
| 1988 | 379,195 | 168,455 | 66,983 | 262,080 | 876,713 |
| 1989 | 453,671 | 208,197 | 87,277 | 360,333 | 1,109,478 |
| 1990 | 515,218 | 261,402 | 96,377 | 401,496 | 1,274,493 |
| 1991 | 590,961 | 327,216 | 134,054 | 437,158 | 1,489,389 |
| 1992 | 716,651 | 412,847 | 162,522 | 551,308 | 1,843,328 |
| 1993 | 1,060,832 | 589,707 | 276,731 | 788,147 | 2,715,417 |
| 1994 | 1,516,212 | 835,761 | 275,628 | 977,026 | 3,604,627 |
| 1995 | 1,865,065 | 1,058,957 | 293,974 | 1,058,679 | 4,276,675 |

## Adjustments at Issue

The adjustments at issue are petitioner's own estimates of the expenditures it incurred during the years in issue in launching 82 new RIC's. Those expenditures were incurred in a series of activities beginning with the development of the idea for the new RIC, and continuing with the development of the initial marketing plan, drafting of the management contract, formation of the RIC, obtaining the board of trustees' approval of the contract, and registering the new RIC with the SEC and the various States in which the RIC would be marketed. This series of activities continues up to the point when each new RIC has been effectively registered with the SEC but before shares in the new RIC are actually offered to the public. These activities are

collectively referred to as "RIC launching activities". No activities incurred after the launch of a new RIC, such as advertising or subsequent annual SEC filings, are included in RIC launching activities, and respondent has not challenged the deductibility of the cost of such postlaunch activities. Petitioner estimates its total costs for RIC launching activities for 81 new RIC's were $1,259,226, $1,591,010, and $659,772, in 1985, 1986, and 1987, respectively. During 1985, petitioner launched a RIC, the estimated costs of which were not included in either the notice of deficiency or the costs stated above. The estimated cost to launch this RIC was $116,318, thereby making the 1985 total cost of RIC launching $1,375,544. Respondent accepts petitioner's estimates for purposes of conclusively establishing the amounts in issue in the instant case.

OPINION

The principal issue for decision is whether petitioner is entitled to a section 162(a) deduction for expenditures incurred in launching 82 RIC's during the years in issue. Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". To qualify as an allowable deduction under section 162(a), an item must: (1) Be paid or incurred during the taxable

year; (2) be for carrying on any trade or business; (3) be an expense; (4) be a necessary expense; and (5) be an ordinary expense.  Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971).

Respondent does not dispute whether the expenditures in issue were "paid or incurred during the taxable year", or whether the expenditures were "necessary" in the accepted sense of "'appropriate and helpful' for 'the development of the [taxpayer's] business'".  Id. at 353 (quoting Commissioner v. Tellier, 383 U.S. 687, 689 (1966)).  However, respondent does not agree that any of the expenditures in issue can be deemed either an "expense" or an "ordinary expense" capable of deduction under section 162.[6]  Id. at 354.

In Commissioner v. Tellier, supra at 689-690, the Supreme Court stated:

> The principal function of the term "ordinary" in §
> 162(a) is to clarify the distinction, often difficult,
> between those expenses that are currently deductible
> and those that are in the nature of capital
> expenditures, which, if deductible at all, must be
> amortized over the useful life of the asset.  * * *

---

[6]In this context, the term "expense" must be distinguished from an expenditure that is capital in nature.  As stated in Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971), a payment that serves to create a separate and distinct asset is, as an inevitable consequence, "capital in nature and not an expense, let alone an ordinary expense".  On the other hand, the principal function of the term "ordinary" has been to distinguish between expenditures that are capital in nature and those that are currently deductible expenses.

A capital expenditure is not an "ordinary" expense within the meaning of section 162(a) and is therefore not currently deductible. Commissioner v. Lincoln Sav. & Loan Association, supra at 353; see sec. 263(a)[7]. The principal effect of characterizing a payment as either an ordinary expense or a capital expenditure concerns the timing of the taxpayer's cost recovery. A business expense is currently deductible, while a capital expenditure is normally amortized and depreciated over the life of the relevant asset, or, if no specific asset or useful life can be ascertained, is deductible upon dissolution of the enterprise. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992). Whether an expenditure may be deducted or must be capitalized is a question of fact. The "'decisive distinctions' between current expenses and capital expenditures 'are those of degree and not of kind'". Id. at 86 (quoting Welch v. Helvering, 290 U.S. 111, 114 (1933)).

An expenditure is capital if it creates or enhances a separate and distinct asset. However, the existence of a separate and distinct asset is not necessary in order to classify

---

[7]Capitalization under sec. 263 takes precedence over current deduction under sec. 162. Sec. 161 provides that the deductibility of the items specified in part VI of the Code (secs. 161 and following, relating to items deductible) is "subject to the exceptions set forth in Part IX (sec. 261 and following, relating to items not deductible)." Sec. 261 clarifies the point from the opposite perspective: "no deduction shall in any case be allowed in respect of the items specified in this part [IX, secs. 261 through 280G]." See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

an expenditure as capital in nature. Another consideration in making such a determination is whether the expenditure provides the taxpayer with long-term benefits. Id. at 87.

Respondent contends that the expenditures petitioner incurred to launch the 82 new RIC's must be treated as capital expenditures. Respondent argues that the costs resulted in the acquisition of separate and distinct assets for petitioner. Respondent also argues that the costs in issue resulted in a significant future benefit for petitioner.

Separate and Distinct Assets

Both parties agree that if the costs of launching the 82 RIC's served to create separate and distinct assets, they must be capitalized and cannot be deducted under section 162(a). Petitioner argues that the expenditures at issue do not produce separate and distinct assets because, among other things, the management contracts with the RIC's are not transferable and no exclusive rights are obtained in the launching process. Petitioner points out that at the time a management contract is entered into, the RIC is an empty shell with no shareholders and no assets and that petitioner will earn revenue from the RIC only if investors make the choice to invest in the RIC after the management contract is entered into. Petitioner contends that a new RIC, and petitioner's management contract with a newly formed

RIC, has no market value unless and until investors place funds in the RIC.[8]

Respondent contends that the expenditures served to create 82 separate and distinct mutual funds and allowed petitioner to obtain ownership in, and control over, those mutual funds through the execution of separate management contracts with each. Respondent claims that the control, or right, represented by each management contract represents a separate and distinct asset for petitioner.

In examining the case law on this issue, we fail to find any controlling definition of the term "separate and distinct asset".[9] Some courts have indicated that the existence of a

---

[8]Petitioner also argues that only a small portion of the costs at issue relates to the actual drafting of the management contracts, the expenditures are not refundable, and the expenditures were not incurred in connection with the purchase of an intangible asset.

[9]Respondent presented the expert testimony of R. Glenn Hubbard, a professor in economics and finance. The main thrust of Professor Hubbard's testimony is directed at the issue of future benefit, rather than the identification of a separate and distinct asset. Professor Hubbard states: "Economic analysis indicates simply that a capital asset is one which produces income and creates value beyond the period in which its cost is incurred. Economically, identifying a separate and distinct asset created by these expenditures is not required." Nevertheless, Professor Hubbard opined that "In this case, mutual fund management contracts are, of course, identifiable assets." According to Professor Hubbard's economic analysis, there seems to be no distinction between future benefit and the existence of an asset. Although we do not necessarily disagree with Professor Hubbard's statements as they relate to economics, his determination of the existence of "separate and distinct assets" is arguably inconsistent with the analysis contained in certain

(continued...)

separate and distinct asset depends upon whether the putative asset has an ascertainable and measurable value; i.e., a fair market value that is convertible to cash.  See NCNB Corp. v. United States, 684 F.2d 285, 290 (4th Cir. 1982); Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775, 784-786 (2d Cir. 1973), revg. T.C. Memo. 1972-43.  On the other hand, the Supreme Court has observed that grounding tax status on the existence of an "asset" would be unlikely to produce a bright-line rule "given that the notion of an 'asset' is itself flexible and amorphous." INDOPCO, Inc. v. Commissioner, supra at 87 n.6.

Where the facts clearly show that expenditures produced a separate and distinct asset, we shall not hesitate to hold that such expenditures must be capitalized on that basis.  See PNC Bancorp, Inc. v. Commissioner, 110 T.C. ___ (1998).  However, based upon the evidence before us and the existing case law, we believe that the inquiry in this case should focus on the duration and extent of any benefits petitioner received from its expenditures, rather than the existence of a separate and distinct asset.

Future Benefit

---

[9](...continued)
previous court opinions.  See Central Texas Sav. & Loan Association v. United States, 731 F.2d 1181 (5th Cir. 1984); NCNB Corp. v. United States, 684 F.2d 285 (4th Cir. 1982); Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775 (2d Cir. 1973), revg. T.C. Memo. 1972-43.

In INDOPCO, Inc. v. Commissioner, supra at 87, the Supreme
Court rejected the argument that the creation or enhancement of a
separate and distinct asset is a prerequisite to capitalization,
explaining that "the creation of a separate and distinct asset
well may be a sufficient, but not a necessary, condition to
classification as a capital expenditure."  The Supreme Court
emphasized the importance of the realization of a significant
future benefit in determining whether an expense should be
capitalized, stating:

> Although the mere presence of an incidental future
> benefit--"some future aspect"--may not warrant
> capitalization, a taxpayer's realization of benefits
> beyond the year in which the expenditure is incurred is
> undeniably important in determining whether the
> appropriate tax treatment is immediate deduction or
> capitalization.  See United States v. Mississippi
> Chemical Corp., 405 U.S. 298, 310 (1972) (expense that
> "is of value in more than one taxable year" is a
> nondeductible capital expenditure); Central Texas
> Savings & Loan Assn. v. United States, 731 F.2d 1181,
> 1183 (CA5 1984) ("While the period of the benefits may
> not be controlling in all cases, it nonetheless remains
> a prominent, if not predominant, characteristic of a
> capital item").  Indeed, the text of the Code's
> capitalization provision, § 263(a)(1), which refers to
> "permanent improvements or betterments," itself
> envisions an inquiry into the duration and extent of
> the benefits realized by the taxpayer.  [INDOPCO, Inc.
> v. Commissioner, 503 U.S. at 87-88.]

The Supreme Court went on to uphold the lower courts' rulings
that capitalization was required because the expenditures in
question provided the taxpayer with significant future benefits.
INDOPCO, Inc. v. Commissioner, supra at 87-89.  Therefore, an

appropriate inquiry in deciding issues of capitalization is "the duration and extent of any benefits that * * * [the taxpayer] received * * * [from its expenditures]".  Connecticut Mut. Life Ins. Co. & Consol. Subs. v. Commissioner, 106 T.C. 445, 453 (1996).

Petitioner's RIC's were primarily organized as separate series within Massachusetts business trusts.[10]  A Massachusetts business trust, like any corporation organized under State law, has perpetual existence.  Also, the series of a trust all have perpetual existence.  Each RIC has a separate management contract with petitioner that must be separately approved by the trustees and the shareholders of each RIC.  No RIC managed by petitioner has ever exercised its right of termination or otherwise failed to renew a management contract with petitioner.  As a general matter, a mutual fund board of trustees will terminate or fail to renew a management contract only in rare circumstances involving fraud or continued mismanagement.

As the RIC's founder, petitioner expects to be awarded the initial contract to manage the new fund, as well as the annual renewals of that contract for as long as the RIC exists.  Here, petitioner's expectation was in fact realized.  The contract between petitioner and the new RIC generally provides fund management services in exchange for remuneration.  Both

---

[10]Two of the RIC's created during the years in issue involved the creation of new Massachusetts business trusts.

petitioner and the RIC realistically expect the relationship to continue indefinitely and, thus, the relationship has an expected life of more than 1 year.

Petitioner viewed the launching of a new RIC as a long-term proposition and generally anticipated that it could take several years for a new RIC to become successful.[11]  Mr. Roger Servison, executive vice president in charge of new business development and corporate policy for Fidelity Investments testified at trial regarding when a RIC would be considered successful, stating:

---

[11]Mr. Edward C. Johnson, III, the chief executive officer of petitioner, testified:

A.  * * * sometimes we bring out new funds, and they can--the germination period can be an incredible period of time.  I mean I think in terms--we started talking about Magellan Fund a little earlier--I think in terms of Magellan Fund, I think we first brought it out in 1962, '63.  Then, there were some taxes put on foreign investment, so that slowed the fund up.

And then we went through the malaise of the early seventies.  I think by--by 1980, the fund had hardly grown one single bit, and needless to say, it cost us a lot of money.  We felt an obligation to the shareholders primarily who were in the fund.

I think we also had a faith that at some point in time, that other investors would come along and then something that had not produced an interest level by the shareholders in the seventies--and the fund was available to investors in the seventies--we had a faith that sometime they--there would be an interest, but it took--with that fund, it really took probably 20 years before it what you might say made any particular contribution to overhead.

A.  We had some rules of thumb.  Typically, we felt that for an equity mutual fund to be a viable size where it would make a profit, it had to be about 100 million or more.  On a bond fund where we charge lower fees, typically, we would look for a fund to be about 200 million, and on a money market fund, where there is a lot of transaction activity and higher expense, typically, you needed 500 million or more for a fund to be profitable.

Q.  And what happens if a fund doesn't reach that size, what does Fidelity do with the fund in that case?

A.  It depends.  First of all, we tend to give funds a long time to become successful because you never know when you launch a fund when a particular investment discipline may be in favor with investors.

Secondly, as I said, one of our objectives was to have a very robust, comprehensive line of funds, so if we felt ultimately, this investment concept might work, we would tend to keep it open.

We would--sometimes we would merge funds that were unsuccessful.  We--we are very reluctant to close a fund because typically, there are some investors in any fund, and it's expensive to close a fund, and you run the risk of creating bad will with those shareholders, so--and it is not all that expensive to maintain a fund once it's up and going.

In addition to potential future revenue from the individual contracts with each new RIC, the new RIC's were expected to produce synergistic benefits to petitioner's entire family of funds.  One of the reasons for launching a new RIC was to provide existing and future investors greater investment options so that these investors would continue, and increase, their investment in petitioner's family of funds.  Having a larger number of investment vehicles from which to choose allows the investor to shift investment from one fund to another within the same fund

family without having to pay a fee, or "load".  This process of moving an investment from one fund to another fund within the same family with no charge is called "an exchange privilege".  In addition, an investor with all his portfolio in a single family of funds receives a report of his entire portfolio on a single statement from a single adviser.  Thus, having numerous funds with different investment objectives is attractive to both existing and future investors which, in turn, increases the likelihood of additional assets invested in the fund family and, because petitioner's fees are based in large part on the amount of assets under management, ultimately more revenue for petitioner from the other RIC's it manages as well.[12]

Most of the RIC's launched during the years in issue still exist in their original form.  As of 1995, they contained more than $109 billion in investments and continue to be a source of substantial management fees for petitioner.  Petitioner expected to realize, and indeed has realized, significant economic and synergistic benefits from its long-term relationships with the RIC's created during the years in issue.

The Court of Appeals for the First Circuit, to which this case is appealable, has stated:

---

[12]In their briefs, the parties disagree about whether petitioner's "customers" are the RIC's (respondent's position) or the investors in the RIC's (petitioner's position).  We think there is some truth in both positions.  However, we do not find either perspective determinative of whether capitalization is required.

a capital expenditure is one that secures an advantage
to the taxpayer which has a life of more than one year,
* * * and that the taxpayer must acquire something of
permanent use or value in his business * * *  It is not
necessary that the taxpayer acquire ownership in a new
asset, but merely that he may reasonably anticipate a
gain that is more or less permanent.  * * *  [Fall
River Gas Appliance Co. v. Commissioner, 349 F.2d 515,
516-517 (1st Cir. 1965), affg. 42 T.C. 850 (1964);
citations omitted.]

In Fall River Gas Appliance Co. v. Commissioner, supra, the
taxpayer, a subsidiary of a seller and distributor of natural
gas, made expenditures consisting of installation costs for
leased gas appliances, primarily water heaters and conversion
burners for furnaces.  Appliances were leased for 1 year
initially, and conversion burners were removable at the will of
the customer upon 24-hour notice.  It was anticipated that the
overall duration of the leases would result in rental income upon
the appliances and greater consumption of gas which would benefit
the taxpayer.  The court stated:

the taxpayer took a considered risk in the installation
of a facility upon the premises of another in
anticipation of an economic benefit flowing from the
existence of the facility over an indeterminable length
of time.  * * * the totality of expenditure was made in
anticipation of a continuing economic benefit over a
period of years and such is indicative of a capital
expense.  The record of gas sales and leased
installations, although certainly not compelling in
such regard, lends some strength to the conclusion that
anticipation has become fact.  [Id. at 517; emphasis
added.]

Like the taxpayer in <u>Fall River Gas Appliance Co.</u>, petitioner
believed that by launching the RIC's it would derive a continuing
economic benefit.[13]

The expenditures at issue bear other indicia of capital
expenditures. The right to market the investment concept,
obtained through the process of executing the contract with the
individual RIC[14] and filing with the SEC and individual States,
is similar to the rights obtained by the taxpayers in <u>P. Liedtka
Trucking, Inc. v. Commissioner</u>, 63 T.C. 547 (1975), and <u>Surety
Ins. Co. v. Commissioner</u>, T.C. Memo. 1980-70. In <u>P. Liedtka
Trucking, Inc. v. Commissioner</u>, <u>supra</u>, the taxpayer, a trucking
business, incurred legal fees in connection with the acquisition
of a Certificate of Public Convenience and Necessity issued by
the Interstate Commerce Commission (ICC), which was required in
order to use several routes between various points in New York,
New Jersey, and Pennsylvania. The taxpayer deducted these costs
as an ordinary expense. We held that the costs incurred in

---

[13]See <u>Union Mut. Life Ins. Co. v. United States</u>, 570 F.2d
382, 392 (1st Cir. 1978) ("expenditures made with the
<u>contemplation</u> that they will result in the creation of a capital
asset cannot be deducted" even though those expenditures were
found to be regularly occurring and did not actually result in
the acquisition of an asset.)

[14]On brief, petitioner states: "The [management] contract
provides the petitioner with nothing more than an opportunity to
try to attract investment to the fund." Petitioner further
states: "The use of the mutual fund as an intermediary mechanism
between an advisor, such as the petitioner, and individual
investors is dictated by the practicalities of the market."

obtaining these operating rights constituted a capital

expenditure, stating:

> The acquisition of these operating rights would enable the petitioner to use several routes between various points in New York, New Jersey, and Pennsylvania.  This authority constitutes an intangible right to operate between these points and a permanent betterment to the petitioner's existing business.  The ICC, in granting petitioner the permanent transfer, conditioned it only on petitioner's ability to provide the public continuous and adequate service.  There is no indication in the record of the ICC's tendency to suspend, change, or revoke this authority.  We can only assume then that the eventual final approval by the ICC that transferred these rights to petitioner's name was for an indefinite period.  [P. Liedtka Trucking, Inc. v. Commissioner, supra at 555.]

In Surety Ins. Co. v. Commissioner, supra, the taxpayer

incurred costs in obtaining certificates of authority to conduct

its business as a surety in several States.  We held that such

expenditures were directly related to the acquisition of the

right to conduct the taxpayer's business in these States.  We

concluded that

> a company initially granted certificates of authority will not be denied renewal unless the company fails to comply with the regulatory scheme.  As such, the license is realistically not intended nor limited to a single year where petitioner complies with state law. See P. Liedtka Trucking, Inc. v. Commissioner, 63 T.C. 547, 555 (1975).  Accordingly, we conclude that such expenditures may not be deducted as business expenses but must be treated as capital expenditures.  [Id.; fn. ref. omitted.]

The costs at issue consist of expenditures to develop the concept for each of the 82 new RIC's, to develop the initial marketing plan, to draft the management contract, to form the RIC's, to obtain the board of trustees' approval of the contract, and to register the new RIC with the SEC and the various States in which the RIC would be marketed. These expenditures secured for petitioner the right to market the particular investment concept of each RIC. Without the approval of the board of trustees, the resulting contract with the RIC, and the necessary filings with the SEC and the individual States, petitioner could not offer shares of the investment vehicle to its investors. Thus, by incurring the costs at issue, petitioner secured a significant long-term benefit.

The expenditures in issue are also similar to organization costs, which are generally considered capital expenditures. Typically, expenditures incurred in connection with organizing, recapitalizing, or merging a business are not currently deductible. See INDOPCO, Inc. v. Commissioner, 503 U.S. at 89-90; E.I. du Pont de Nemours & Co. v. United States, 432 F.2d 1052, 1058 (3d Cir. 1970); Skaggs Cos. v. Commissioner, 59 T.C. 201, 206 (1972).

In launching a new RIC, petitioner prepares memoranda for the board of trustees, prepares a prospectus and other applications for the SEC and State approvals, registers each RIC, and prepares the governing contract. Petitioner then acquires an

ownership interest in the newly formed RIC by paying between $1 and $3 million for stock and, as sole shareholder, votes to approve the initial management contract.  These costs are similar to organizational expenditures of a corporation[15] or partnership

---

[15]Sec. 1.248-1(b)(2), Income Tax Regs., provides the following examples of corporate organizational expenditures:

legal services incident to the organization of the corporation, such as drafting the corporate charter, by-laws, minutes or organizational meetings, terms of original stock certificates, and the like; necessary accounting services; expenses of temporary directors and of organizational meetings of directors or stockholders; and fees paid to State of incorporation.

and to syndication expenses,[16] none of which are currently deductible.  Secs. 248(a); 709(a).

Petitioner argues that the costs associated with these activities are not organization costs with regard to petitioner because the costs do not relate to its capital structure and were incurred solely to maintain and promote its investment management business.  Nevertheless, much like the reorganization expenditures in E.I. du Pont de Nemours & Co. v. United States, supra, we find that the costs incurred by petitioner here "resulted in a benefit to the taxpayer which could be expected to

_____

[16]Sec. 1.709-2(a), Income Tax Regs., provides the following examples of partnership organizational expenditures:

> Legal fees for services incident to the organization of the partnership, such as negotiation and preparation of a partnership agreement; accounting fees for services incident to the organization of the partnership; and filing fees.  * * *

Sec. 1.709-2(b), Income Tax Regs., defines syndication expenses as follows:

> Syndication expenses are expenses connected with the issuing and marketing of interests in the partnership. Examples of syndication expenses are brokerage fees; registration fees; legal fees of the underwriter or placement agent and the issuer (the general partner or the partnership) for securities advice and for advice pertaining to the adequacy of tax disclosures in the prospectus or placement memorandum for securities law purposes; accounting fees for preparation of representations to be included in the offering materials; and printing costs of the prospectus, placement memorandum, and other selling and promotional material.  * * *

produce returns for many years in the future" and, therefore, are not deductible.  Id. at 1059.

Petitioner acknowledges that the expenditures it incurred in launching the new RIC's may result in the future benefit of preserving, promoting, and expanding its investment management business.  However, petitioner contends that this type of future benefit has never been held to require capitalization. Notwithstanding INDOPCO, Inc. v. Commissioner, supra, petitioner argues that there are numerous court decisions which support the principle that the costs of expanding or preserving an existing business are deductible expenses rather than capital expenditures.  E.g., NCNB Corp. v. United States, 684 F.2d 285 (4th Cir. 1982); Colorado Springs Natl. Bank v. United States, 505 F.2d 1185 (10th Cir. 1974); Briarcliff Candy Corp. v. Commissioner, 475 F.2d 775 (2d Cir. 1973), revg. T.C. Memo. 1972-43; Equitable Life Ins. Co. v. Commissioner, T.C. Memo. 1977-299.

In Briarcliff Candy Corp. v. Commissioner, T.C. Memo. 1972-43, the taxpayer, an urban candy manufacturer, incurred certain expenses to maintain its dwindling market share by forming a separate franchise division within the company to obtain display contracts with drugstores in suburban locations.  We held that the expenditures incurred in obtaining these contracts were capital expenditures, stating:

> Regardless of whether amounts expended by petitioner
> are designated as promotional expenses, advertising

expenses or selling expenses, it is apparent that petitioner obtained contracts which provided a channel of marketing distribution which would be a benefit to petitioner in future years. The benefits derived from contracts with the drugstore outlets were not merely incidental to income in future years but were instrumental in the production of such income.
* * * [Id.]

The Court of Appeals for the Second Circuit reversed, finding that the franchising costs did not enhance or create a "separate and distinct additional asset." The court held that the costs were incurred in an effort by the taxpayer to maintain its current business profits and customers and were therefore currently deductible. Briarcliff Candy Corp. v. Commissioner, 475 F.2d at 786-787. The Court of Appeals' reliance on a "separate and distinct asset" test was based upon its reading of Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971), which the Court of Appeals stated had "brought about a radical shift in emphasis" that required expenditures to be capitalized only where the expenditures created or enhanced a separate and distinct asset. Briarcliff Candy Corp. v. Commissioner, 475 F.2d at 782. In reaching its conclusion that the expenses were deductible, the Court of Appeals disregarded the resulting future benefits obtained by the taxpayer.

The Court of Appeals for the Tenth Circuit in Colorado Springs Natl. Bank v. United States, supra, expanded on Briarcliff Candy Corp. v. Commissioner, supra, in holding that the costs of establishing credit card operations were deductible

by banks since a credit card operation was merely a new method of operating an old business. The Court of Appeals reasoned that, since the taxpayer did not acquire a separate and distinct asset from the expenditures, capitalization was not required.

In NCNB Corp. v. United States, supra, the Court of Appeals for the Fourth Circuit held that costs incurred in developing bank branches (such as expansion plans, feasibility studies, and regulatory applications) were immediately deductible. The court cited Commissioner v. Lincoln Sav. & Loan Association, supra, in determining that the expenditures were currently deductible because they did not create or enhance separate and identifiable assets. NCNB Corp. v. United States, supra at 294. Although the court recognized that a future benefit is a factor to be considered, the language of the decision clearly emphasized the lack of a separate and distinct additional asset in arriving at its conclusion:

> The money spent or obligated for metro studies, feasibility studies, and applications to the Comptroller of the Currency, it seems to us, adds nothing to the value of a bank's assets which can be so definitely ascertained that it must be capitalized. Certainly no "separate and distinct additional asset" is created. While the benefit of all of these classes of expenses may or may not endure for more than one year, that is but one factor to be considered. The branch has no existence separate and apart from the parent bank; as a branch bank, it is not readily salable and has no market value other than the real estate which it occupies and the tangible equipment therein. [Id. at 293.]

Petitioner also relies heavily on a Memorandum Opinion of this Court, Equitable Life Ins. Co. v. Commissioner, T.C. Memo. 1977-299. In Equitable Life Ins. Co. v. Commissioner, supra, we held that expenses incurred by an insurance company in registering certain variable annuity contracts under the Securities Act of 1933 and registering as a management investment company pursuant to the provisions of the Investment Company Act of 1940 were deductible. In reaching this conclusion, we emphasized that the registration expenses were "normal, usual and customary in the day-to-day operations of the insurance business." We also found that the expenses were not incurred in the acquisition of a capital asset. However, we did not analyze, nor did we discuss, whether the expenses in question produced a significant long-term benefit for the taxpayer.

The aforementioned cases upon which petitioner relies were decided prior to the Supreme Court's decision in INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992). In fact, the Supreme Court granted certiorari in INDOPCO, Inc. v. Commissioner, supra at 83 n.3, to resolve a perceived conflict among various Courts of Appeals and specifically cited NCNB Corp. v. United States, supra, and Briarcliff Candy Corp. v. Commissioner, supra. In INDOPCO, Inc. v. Commissioner, 503 U.S. at 90, the Supreme Court held that investment banking fees and other fees paid by the taxpayer in connection with a friendly acquisition had to be capitalized because they provided significant long-term benefits

to the taxpayer's existing business.  The taxpayer, relying on

Commissioner v. Lincoln Sav. & Loan Association, supra, argued

that these costs did not have to be capitalized because no

separate and distinct asset was created.  The Supreme Court

disagreed, stating:

> Lincoln Savings stands for the simple proposition
> that a taxpayer's expenditure that "serves to create or
> enhance * * * a separate and distinct" asset should be
> capitalized under § 263.  It by no means follows,
> however, that only expenditures that create or enhance
> separate and distinct assets are to be capitalized
> under § 263.  * * *  In short, Lincoln Savings holds
> that the creation of a separate and distinct asset well
> may be a sufficient, but not a necessary, condition to
> classification as a capital expenditure.  * * *
> [INDOPCO, Inc. v. Commissioner, supra at 86-87.]

Emphasizing the importance of the realization of a significant

future benefit in determining whether an expenditure should be

capitalized, the Supreme Court upheld the lower courts' findings

that the expenditures produced significant future benefits that

required the costs to be capitalized.[17]  INDOPCO, Inc. v.

Commissioner, supra at 90; Connecticut Mut. Life Ins. Co. v.

Commissioner, 106 T.C. at 453.  Thus, whether an expenditure

produces a significant future benefit beyond the current taxable

year remains a prominent, indeed a predominant, characteristic of

an expenditure that must be capitalized.

---

[17]The Supreme Court found that the lower courts' findings of
fact were amply supported by the record.  INDOPCO, Inc. v.
Commissioner, 503 U.S. at 88.

We recognize that capitalization is not required for every cost that produces any future benefit. However, we do not agree with petitioner's proposition that the claimed purpose of the expenditures--to protect, promote, or expand its existing business--is controlling. Rather than attempting to assign the expenditures to a specific classification, such as expansion costs, we believe that the more important question is whether the expenditures in issue provide a significant future benefit to petitioner.

Finally, petitioner argues that the legislative history of section 195 supports its position that the expenditures here do not create the "type" of future benefit that must be capitalized. Petitioner contends that Congress explicitly recognized the current deductibility of the costs of expanding an existing trade or business when it enacted section 195 to deal with the costs of starting a new trade or business. Section 195 was enacted by the Miscellaneous Revenue Act of 1980, Pub. L. 96-605, sec. 102(a), 94 Stat. 3522, and was amended by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 94(a), 98 Stat. 614. Section 195, as originally enacted in 1980, defined "startup expenditure" to mean any amount

(1) paid or incurred in connection with--

      (A) investigating the creation or acquisition of an active trade or business, or

      (B) creating an active trade or business, and

(2) which, if paid or incurred in connection with the expansion of an existing trade or business (in the same field as the trade or business referred to in paragraph (1)), would be allowable as a deduction for the taxable year in which paid or incurred.[18]  [Emphasis added.]

Petitioner claims that the legislative history accompanying the 1980 enactment of section 195 confirms that Congress explicitly recognized that business expansion costs are currently deductible:

> In the case of an existing business, eligible startup expenditures do not include deductible ordinary and necessary business expenses paid or incurred in connection with an expansion of the business.  As under present law, these expenses will continue to be currently deductible.  * * * [H. Rept. 96-1278, at 11 (1980), 1980-2 C.B. 709, 712; emphasis added.]

---

[18]Sec. 195(c), as amended, defines startup expenditure to mean any amount--

(A) paid or incurred in connection with--

(i) investigating the creation or acquisition of an active trade or business, or

(ii) creating an active trade or business, or

(iii) any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity becoming an active trade or business, and

(B) which, if paid or incurred in connection with the operation of an existing active trade or business (in the same field as the trade or business referred to in subparagraph (A)), would be allowable as a deduction for the taxable year in which paid or incurred.

Petitioner interprets this language to mean that Congress expected and directed that all expansion costs for an existing trade or business are currently deductible. We do not agree with petitioner's reading of this legislative history. Congress was simply recognizing that if an expenditure was currently deductible, section 195 did not change the characterization of the expenditure if it was paid or incurred in connection with the expansion of an existing business. Thus, Congress was distinguishing these expenditures from those paid or incurred in the creation or acquisition of a new trade or business to which section 195 did apply. H. Rept. 96-1278, supra at 11, 1980-2 C.B. at 712-713 ("The determination of whether there is an expansion of an existing trade or business or a creation or acquisition of a new trade or business is to be based on the facts and circumstances of each case as under present law.")

In NCNB Corp. v. United States, 684 F.2d at 291, the court found the enactment of section 195 was "another indication that the expenditures in question [were] current expenses rather than capital costs". Relying on the definition of "investigatory

costs" contained in the House report accompanying section 195,[19] the Court of Appeals for the Fourth Circuit determined:

> Congress is thus under the impression that expenditures for market studies and feasibility studies, as at issue here, are fully deductible if incurred by an existing business undergoing expansion.  An interpretation by us to the contrary would render § 195 meaningless for it would obliterate the reference point in the statute-- "the expansion of an existing trade or business." [NCNB Corp. v. United States, supra at 291.]

Although, the court found that the investigatory expenditures in question in that case did not require capitalization, we find that neither that holding, nor the statutory language of section 195, requires that every expenditure incurred in any business expansion is to be currently deductible.

Under petitioner's reasoning, any expenditure incurred in the expansion of an existing business would be deductible. Obviously this is not a proper interpretation of the law. Section 195 allows taxpayers to amortize "startup" expenses only when such expenses, "if paid or incurred in connection with the

---

[19]As an example of expenditures, which would be allowable deductions for an existing business, the House report that accompanied sec. 195 explained:

> Under the provision, eligible expenses consist of investigatory costs incurred in reviewing a prospective business prior to reaching a final decision to acquire or to enter that business.  These costs include expenses incurred for the analysis or survey of potential markets, products, labor supply, transportation facilities, etc.  * * *  [H. Rept. 96-1278, at 10 (1980), 1980-2 C.B. 709, 712.]

operation of an existing active trade or business * * * would be allowable as a deduction for the taxable year in which paid or incurred."  Sec. 195(c)(1)(B).  Section 195 did not create a new class of deductible expenditures for existing businesses. Rather, in order to qualify under section 195(c)(1)(B), an expenditure must be one that would have been allowable as a deduction by an existing trade or business when it was paid or incurred.  See Duecaster v. Commissioner, T.C. Memo. 1990-518 ("Nothing in the statute or the legislative history suggests that section 195 was intended to create a deduction, by way of amortization, in respect of an item which would not, in any event, have been deductible under prior law.").[20]

---

[20]As Judge Murnaghan, who wrote the panel opinion in NCNB Corp. v. United States, supra at 295, stated in his dissent to the en banc majority opinion:

> It requires a giant, and unjustified leap, to derive from the justification set out in the legislative history any support for the proposition that all investigatory costs are automatically deductible, irrespective of length of life.  Eligible expenses under IRC § 195 include "investigatory costs incurred in reviewing a prospective business prior to reaching a final decision to acquire or to enter that business."  S. Rep. No. 1036, supra, at 7301.  But that is only one of the qualifications.  In addition, to qualify as an eligible expense, an expenditure "must be one which would be allowable as a deduction for the taxable year in which it is paid or incurred if it were paid or incurred in connection with the expansion of an existing trade or business."  Id.

> Thus, the legislative history does not purport to say that all investigatory costs are deductible.  To

(continued...)

We have found that petitioner contemplated and received significant, long-term benefits as a result of the expenditures it incurred in the creation of 82 RIC's during the years in issue.  The future benefits derived from these RIC's were not merely incidental.  Accordingly, we hold that these expenditures do not qualify for deduction as "ordinary and necessary" business expenses under section 162(a).

Amortization

Having concluded that the amounts expended by petitioner were in the nature of capital expenditures, we must decide whether petitioner is entitled to a deduction for the amortization of such costs.  Section 167(a) allows taxpayers to take a depreciation deduction for property used in a trade or business.  Section 167 is not limited in its application to tangible property, but is also applicable to intangibles.  Section 1.167(a)-(3), Income Tax Reg., provides:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the

[20](...continued)
the contrary, it explicitly limits its application solely to those investigatory costs which are deductible in nature.  The implication is inescapable that there are other investigatory costs which are not deductible, i.e. are to be capitalized.  Consequently, we are brought straight back to the question we started with:  In the case of each expenditure, was it deductible, or capitalizable?  * * *

length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance.  Examples are patents and copyrights.  An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation.  No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life.  * * *

The standard for deciding whether an intangible is depreciable under section 167 was enunciated in Newark Morning Ledger Co. v. United States, 507 U.S. 546, 566 (1993), as follows:

a taxpayer [must] prove with reasonable accuracy that an asset used in the trade or business or held for the production of income has a value that wastes over an ascertainable period of time * * *

The availability of a depreciation deduction is primarily a question of fact, id. at 560, on which the taxpayer bears the burden of proof.  Id. at 566.

Petitioner contends (in the alternative) that the expenditures it incurred in launching the RIC's should be amortized over an average useful life of 2.2 years.  Petitioner argues that the recovery period of 2.2 years is determined by the average life of initial investments in a new RIC and is similar to the recovery of bank acquisition expenditures allocable to the deposits in the acquired bank over the period in which these deposits can be shown to decline in value to the acquirer.  See Citizens & S. Corp. v. Commissioner, 91 T.C. 463 (1988), affd. 919 F.2d 1492 (11th Cir. 1990).

Petitioner conducted studies to determine the useful life of a new RIC based solely on the estimated duration of the <u>initial</u> investments in a new RIC from customers who invested during the first 6 months of the existence of the RIC.  Petitioner argues that the reason a 6-month time period was selected for this study is that during the taxable years in issue, current performance information about a new mutual fund was not available for the first 6 months after a new RIC's introduction.  Thus, petitioner posits, any investors who decided to invest in a new mutual fund during the first 6 months after its introduction would necessarily have based their decision on factors other than current performance.  In petitioner's view, these are the only investors that conceivably could be attributed to the actions undertaken by petitioner during the period prior to the launch date of a new RIC.

Petitioner provides no support for its assumption that the benefits of the expenditures it incurred were limited solely to initial investors.[21]  In fact, we have found that the benefits received from the RIC launching costs were significant and long lasting and certainly not limited to initial investments.

---

[21]Petitioner submitted the expert report of Fred C. Lindgren, an actuary with Coopers & Lybrand L.L.P.  Although Mr. Lindgren's report set forth in great detail the methodology and statistics used to determine the average useful life of these initial investments, he relied upon petitioner's request to focus on investments made in the first 6 months rather than his own independent analysis.

Accordingly, we find no reason to limit the analysis of a new RIC's useful life to the duration of investments invested in the first 6 months of a RIC's existence. Furthermore, the evidence fails to reveal any basis for determining an alternate useful life. Therefore, we find that petitioner has failed to meet its burden of establishing a limited life for the future benefits obtained from the expenditures it incurred during the years in issue.

<u>Decision will be entered under Rule 155</u>.